

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-25-2003

# USA v. Irizarry

Precedential or Non-Precedential: Precedential

Docket No. 01-4484P

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Irizarry" (2003). *2003 Decisions.* Paper 302.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/302

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed August 25, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-4484

UNITED STATES OF AMERICA

v.

ELVIS IRIZARRY,

Appellant

Appeal from the United States District Court
for the District of New Jersey
(Crim. No. 00-cr-00333-2)
District Court: Hon. Nicholas H. Politan

Argued: September 17, 2002

Before: BECKER, *Chief Judge*,* SCIRICA** and McKEE,
*Circuit Judges*

(Opinion filed: August 25, 2003)

ROY B. GREENMAN, ESQ. (Argued)
Budin, Greenman & Greenman
1379 Morris Avenue
Union, New Jersey 07083
*Attorneys for Appellant*

---

* Judge Becker completed his term as Chief Judge on May 4, 2003.

** Judge Scirica started his term as Chief Judge on May 5, 2003.

CHRISTOPHER J. CHRISTIE, ESQ.
United States Attorney
GEORGE S. LEONE, ESQ.
Chief, Appeals Division
RICHARDO SOLANO, JR., ESQ.
  (Argued)
Assistant United States Attorney
970 Broad Street
Newark, New Jersey 07102
*Attorneys for Appellee*

## OPINION OF THE COURT

McKEE, *Circuit Judge*.

Elvis Irizarry appeals his convictions for violating, and conspiring to violate, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962 (c) and (d), a drug offense, and several other substantive offenses. His major complaint is that the government improperly joined and tried separate and unrelated crimes and conspiracies he allegedly committed with several individuals over the course of many years. We will affirm the convictions for the reasons set forth below.

## I.  FACTUAL BACKGROUND

Viewed in a light most favorable to the government, the trial evidence showed that Irizarry was a central member of a criminal group that operated out of Jersey City, New Jersey for more than seven years. Irizarry's principal job was carrying out the group's criminal activities, including *inter alia*, murder, arson, armed robbery, drug trafficking, and the extortionate collection of debts. Franco Durso was Irizarry's boss. Durso told Irizarry what to do "if anything needed to be done so far as . . . persuad[ing] people to do things, to get something done." App. at 3163. As the boss, Durso had the final say over Irizarry's and the group's activities. For, example, when John McGuinness came to Irizarry with a proposal to rob a check-cashing supermarket in Paterson, New Jersey, Irizarry told

McGuiness that he "had to clear it with Franco [Durso] before [McGuiness] could talk to [Irizarry]." App. at 3169.

Irizarry carried out the group's criminal activities through a group of associates that included, among others, Michael Soto, Raymond Looney, Joseph Sammartino, Lee Farrell and Samier Bakhoury (the "crew"). These five individuals formed the core membership of Irizarry's crew although others were associated with it from time to time.

Durso "ran the show" for Massimo Ranieri in Jersey City, and Durso and Irizarry both answered to Ranieri. App. at 3168. Ranieri was next in line to take control of a group that was the Sicilian wing of the notorious Gambino crime family. Ranieri was based in Brooklyn, New York, but also spent time in Florida. Ranieri's criminal activities included debt collection, extortion and murder.

Durso paid a weekly "tribute to Ranieri in the amount of $500 to $600. App. at 3198-99. McGuiness testified that a "tribute" is "[w]hen you pay somebody to look over you. Watch out for you" with regard to "disputes and stuff." *Id.* For example, McGuiness once approached Durso because "Timmy," a man McGuinness knew, had been "stiffed" on a bet "with some bookmaker in New York." App. at 3201-02. Durso brought McGuiness and Timmy to Brooklyn to meet Ranieri. Ranieri spoke to Timmy alone and "[a] few days later [Timmy] got his money." App. at 3203.

## A. Loansharking.

Loansharking was one of the principal ways the group generated income. Durso loaned his own money, as well as money belonging to others including McGuiness, Anthony Rotolo, (also known as "Tony the Guinea)," and Rocco Errico. If Durso was not repaid, Irizarry was sent to collect. Between 1993 and 2000, Irizarry took various crew members — including, Farrell, Looney, Sammartino and Soto — with him on collection rounds in order to have "extra bodies" that would "intimidate people." App. at 2766. When problems arose, Irizarry and the crew would resort to violence. For example, Looney testified about one occasion in early 1996, in which Irizarry confronted John Yengo at Carmine's Bar. Yengo owed money to several people,

including Durso, but he was not making payments. Irizarry went into the bathroom to "talk" to Yengo while Looney remained outside. Looney stated he "heard a commotion" coming from the bathroom. App. at 2989. When Looney went inside the bathroom to check, he saw Irizarry and Yengo "scuffling" and saw Irizarry hit Yengo over the head with a hammer. App. at 2989-90. According to Looney, Irizarry then proceeded to "beat[ ] [Yengo's] ass." *Id.* Yengo then "immediately [took some money] . . . out of his pocket and handed" it to Irizarry. App. at 2990. According to Looney, Yengo tried to explain that he came to Carmine's "to talk to Franco [Durso] to tell him he needed time to pay." *Id.*

A similar incident involved someone known as "Farice," or "The Fisherman." Farice owed approximately $20,000 to Durso, approximately $30,000 to an individual named "Michael Scurti" and he owed an unknown amount to Rotolo. At some point, Farice received a settlement check and used some of the proceeds to pay Scurti, but not Durso. When Durso learned that Scurti had been favored he told Irizarry, "Let's go down and straighten it the f[_] out." App. at 2992. A week later, Irizarry entered the Italian American Club that was across the street from Durso's pizzeria and returned with a "bloodied up" Scurti. App. at 2992093. Irizarry later told Looney that Scurti "got his ass beat" and he was "going to have to pay that money." App. at 2993.

On another occasion, Looney recalled accompanying Irizarry to a gas station in Fort Lee, New Jersey to make a collection. On the way, Irizarry asked Looney if he would have a problem killing the man who owed the money if he did not pay. Looney assured Irizarry he would do whatever it would "take to get this over with," App. at 2993. However, this incident did not result in anyone being killed.

On yet another occasion, Durso approached McGuiness for information about a pizzeria supplier who owed Durso money, and McGuiness informed Durso of the supplier's schedule. Irizarry arrived at a local pizzeria on the date scheduled for that supplier's deliveries and gave him "a little shot in the head." App. at 3192-94. Although McGuiness did not see the attack, he saw Irizarry go into

the pizzeria, and thereafter saw the supplier "running out . . . holding his head and scared. He was bleeding." App. at 3194.

### B. Cocaine Trafficking.

The crew also generated income by trafficking in illegal drugs. From as early as 1991 or 1992, Durso sold cocaine out of his pizzeria and out of two bars in Jersey City — "Carmine's" and "Martucci's". McCloskey assisted Durso's drug trafficking by "cutting" cocaine for Durso, preparing it for resale, and occasionally selling it. Durso sometimes gave McCloskey funds to purchase drugs, and the two referred to themselves as "partners."

Irizarry's role in the trafficking scheme consisted of traveling to New York to purchase cocaine and then transporting it back to Jersey City. Irizarry used crew members Sammartino, Soto, Bakhoury, Farrell and Looney to help transport drugs as early as 1993. The routine was generally the same. One or more crew members drove to New York City with Irizarry. There, Irizarry purchased drugs either at a "bodega" or a Cuban sandwich shop. They would then return together to Jersey City and deliver the cocaine to Durso or McCloskey. On occasion, Irizarry made the crew member transport the cocaine back to New Jersey by train while he drove back alone by car.

Although Irizarry controlled the actual transportation of the cocaine, Durso had ultimate control of the operation. A 1996 episode illustrates the relative authority of the two confederates. Sometime early that year, Irizarry wanted Bakhoury to take over his role in the drug operation while he, Irizarry, was in Italy. However, Durso refused to allow Bakhoury to do so because Bakhoury smoked marijuana, and Durso apparently thought that Bakhoury could not be trusted.

### C. Armed Robbery.

In early 1994, Irizarry hand picked members of his crew for an armed robbery of an armored truck that delivered money to and from the Kingsbrook Jewish Medical Center

in Brooklyn, New York. The robbery scheme apparently resulted from a "tip" Irizarry had received from associates in New York with an "inside connection." App. at 2739, 2119. The robbery afforded Irizarry an opportunity "to build a reputation for himself," and he stated that it would also be a good thing for the "old man," i.e., Ranieri. App. at 1467.

Irizarry, Sammartino, Farrell and Bean had several discussions about the details of the robbery, and Durso and Irizarry eventually arranged for a car that would provide the necessary transportation. However, after members of the crew "cased" the hospital, Farrell became concerned over "how dangerous [the scheme] was" and informed Durso of his concerns. App. at 2747-48. The robbery was called off, but Irizarry later told Farrell the robbery was important to him (Irizarry) and that the planners were fortunate they were still alive.

Around the same time in early 1996, Irizarry discussed a number of robberies with other confederates including Soto and Looney. The discussions included robbing a supermarket that cashed checks in Paterson, New Jersey, and a check cashing business in Hoboken, New Jersey. McGuiness targeted both these businesses for the group, but he had to get Durso's permission before discussing the robberies with Irizarry's crew. On each occasion, Irizarry's crew went as far as "casing" the businesses even though they did not actually commit the robberies. The Paterson robbery was called off because Irizarry and another crew member were arrested on the day the robbery was to occur after police officers stopped Irizarry's car and discovered a bulletproof vest and a can of mace.

### D. Arson.

In 1996, Russell Laviola informed Durso that he was having difficulty collecting rent from tenants at a building located at 214 Belvidere Avenue in Jersey City, New Jersey, that Laviola owned. Durso responded by telling Irizarry to visit the tenants with Laviola. Irizarry did so, and informed the tenants that "he was involved with the house . . . [and] wanted to get the rent." App. at 2675. The tenants

apparently got the message because they thereafter paid Laviola some of the delinquent rent. Laviola, in turn, gave Irizarry $100 at Durso's request.

However, the tenants moved out of the building about a week later, and Laviola thereafter informed Durso that he (Laviola) was having a difficult time selling the property. Ever ready to volunteer a solution for a friend in need; Durso responded by suggesting the problem could be solved by burning the building down. Laviola agreed and paid Durso between $2,000 and $5,000. Thereafter, on March 18, 1996, Durso sent Irizarry and Looney to the building where they used gasoline to incinerate the building. App. at 2707, 2973. Thereafter, they went to Carmine's Restaurant where they informed Durso that they had "burned the place down." App. at 2973. However, Laviola remained dissatisfied even though he collected $40,000 in insurance proceeds, because the house did not burn all the way to the ground.[1]

A couple of months later, someone known as "Red" contacted Durso because he needed to dispose of his house on Sherman Avenue in Jersey City. Durso had Irizarry, Looney and Garry Biase, a friend of Looney's, visit Red to discuss the specifics. On June 17, 1996, Irizarry, Looney and Biase drove to the property, poured gasoline "into the bearing wall," "let it soak in" and then set it on fire. App. at 2985. They then returned to Carmine's Restaurant. However, Durso later expressed his displeasure to Looney because once again the house had not burned completely down.

## E. Several Murders.

### 1. Giancarlo Ravasi.

In 1991, Giancarlo Ravasi owed money to Ranieri and several others. At one point, Ravasi borrowed money from a third person to pay Ranieri. Around this time, Ravasi went to Italy. He returned in the summer of 1993 and

---

1. Although Durso told Laviola he would send Irizarry back, there was no testimony about whether Irizarry ever "finished the job."

moved to New York where he eventually obtained employment as a butcher at a supermarket in Brooklyn. App. at 1030.

In late summer of 1993, Irizarry told Soto that he had to "go do somebody because somebody was testifying in court against one of his friends." App. at 1150. He further informed Soto that the target was a butcher in Brooklyn. He also explained that he needed Soto's help because Soto was a known car thief "as well as a good driver," app. at 1151, who could steal a car and drive Irizarry to Brooklyn. In return for Soto's participation, Irizarry offered Soto $6,000 from his "take" and explained that it would be paid "upon completion" by the people Irizarry was working for. App. at 1153.

On September 24, 1993, at approximately 3:00 a.m., Soto picked up Irizarry in a stolen van and drove him to Brooklyn. When they arrived, they waited until they saw a man fitting Ravasi's description walking down the street with a woman toward the supermarket where Ravasi worked. As Ravasi turned the corner, Irizarry got out of the van, walked up behind Ravasi and fired one fatal shot to the back of Ravasi's head at close range. Irizarry then fled to Manhattan in the van. There, he and Soto abandoned the van, and took separate trains back to New Jersey.

### 2. Joseph Marmora and Antonio Pavone.

In 1993, Durso's cousin, Joseph Marmora, was spending a lot of time with Ranieri and other crime figures from Brooklyn, including Anthony Persichetti, who was also known as "Big Tony." Persichetti testified that Ranieri had introduced him to Marmora in 1992, and that Marmora wanted to get involved in criminal activities.

On December 30, 1993, Sammartino drove Irizarry to Marmora's apartment where Marmora let them in. Marmora's roomate, Pavone, was in the apartment. While Sammartino and Pavone stayed in the apartment, Irizarry and Marmora stepped out into the hallway to talk. "[A] couple of minutes later," Irizarry returned, holding Marmora "by the back of the collar or shirt." App. at 1448-49. Irizarry made Marmora kneel by pointing a gun at him

as he told Sammartino to "find stuff to tie Joseph up with." App. at 1149-50. When Sammartino hesitated, Irizarry put the gun in his face and told him "to hold the gun and point it at Joe" while Irizarry retrieved "belts and ties" from the apartment. App. at 1450-51. Irizarry then tied Marmora's hands behind his back and his ankles, "pulled a knife," and stabbed Marmora numerous times. App. at 1452-53. Irizarry interrupted the stabbing long enough to walk over to the couch where Pavone was praying, and shoot Pavone in the head at close range.

In the meantime, Marmora somehow managed to break free and "attack[] Elvis," and they "began to wrestle around." App. at 1454. Marmora eventually "got off of Elvis and staggered out of the room," app. at 1454, only to be followed by Irizarry who shot him three times. Apparently not yet satisfied with the carnage he had thus far wreaked, Irizarry then slit Marmora's throat, leaving a wound that was ten inches long and an inch deep that severed Marmora's right jugular vein. The subsequent autopsy revealed a total of 48 stab and cutting wounds on Marmora's body.

Irizarry then returned to the apartment and told Sammartino to wait in the car. About "five minutes or so" later, Irizarry returned to the car "carrying an arm full of clothes," app. at 1456, and instructed Sammartino to drive to an industrial area of Brooklyn where Irizarry threw the clothes into a dumpster. App. at 1457.

Later that same night, Irizarry told Sammartino "that his people were connected, and that if [Sammartino] were to say anything" he "would end up dead no matter where" he went. App. at 1457-58. Irizarry also told Sammartino that if he did not say anything he could "make a lot of money," and he referred to an "old man" named Massimo. App. at 1458, 1459. Irizarry later told Sammartino that "the old man was very pleased with what had happened." App. at 1461.

Sammartino had borrowed the car he used to drive Irizarry to Marmora's apartment from Edward Pierce. After the murders of Marmora and Pavone, Irizarry was "very concerned . . . that Edward Pierce would say something to

the police because . . . a lot of people in the neighborhood knew about what had happened." App. at 1461. Irizarry considered killing Pierce, but Sammartino rejected that idea. Sammartino did, however, agree to "get rid of the car . . . [i]n case [it contained traces] of any blood, [or other] evidence." App. at 1462.

On January 24, 1994, Sammartino and Pierce took the car to an industrial area of Newark and set it on fire. However, police arrived while it was burning and arrested both of them. They eventually pled guilty to arson, but they said nothing about the murders of Marmora and Pavone "[o]ut of fear." App. at 1465. Rather, Pierce told police that he burned his car for insurance proceeds.

Durso became upset when he was told of Marmora's death. McGuiness asked Durso: "How does it feel? You know, that Elvis supposedly is the one that took out Joey Marmora and that's your cousin?" App. at 3200. Durso replied, "How do you think the door got opened?" App. at 3201.

### 3. Kyle Veale.

In late 1993, Kyle Veale borrowed $3,000 from Irizarry, but failed to repay it. Irizarry told Bakhoury that the money had come from "[t]he guys he's connected with down at [Carmine's]," and asked him to talk to Veale about it. App. at 2088-90. Bakhoury knew that Durso was one of the "guys." App. at 2089. Bakhoury did speak with Veale about the loan and warned him not to "mess with Elvis." App. at 2090. Bakhoury subsequently told Irizarry that Veale had taken money out of a bank account that Bakhoury owned jointly with Veale. Irizarry responded by telling Bakhoury to "kick his ass." App. at 2091.

On January 1, 1994, Irizarry and Bakhoury picked up Veale at the latter's apartment and drove to a local high school to test some firearms and silencers. Bakhoury fired a .22 caliber firearm and Irizarry fired a .9 mm. As they tested the firearms, Irizarry came up behind Bakhoury, pressed a gun to the back of Bakhoury's neck and ordered him to shoot Veale. Bakhoury did as ordered, and continued shooting Veale until his bullets ran out — a total

of five times. Irizarry then took the murder weapon and warned Bakhoury that his "prints [were] on it" so he better stay quiet. App. at 2105-06. Irizarry also told Bakhoury that he had to "learn to be tough because if Kyle gets over on [him], everybody is going to get over on [him]." App. at 2106-07.

### 4. Jose Ruiz.

Irizarry was spending a lot of time with Jose Ruiz in early 1997. Ruiz apparently enjoyed the attention resulting from his association with Irizarry. During this period, Irizarry recruited Ruiz to participate in an armed robbery. Ruiz, in turn, attempted to recruit two of his friends to help out, but they refused.

However, the relationship between Irizarry and Ruiz soured in February of 1997, after Irizarry told several people that he suspected that Ruiz had burglarized his apartment. This resulted in a change in Ruiz' attitude toward Irizarry, and Ruiz began trying to avoid Irizarry. According to Riuz' brother, Jose "didn't want to be next to [Irizarry]," "he was very scared about something." App. at 3481-82.

Ruiz left his house with Irizarry on February 28, 1997, and was never seen alive again. Ruiz' body was found the next day near a local high school, about two to three miles from where Veale had been shot. Ruiz had been fatally shot in the right ear at close range.

Irizarry later admitted killing Ruiz to Angelina Francolino and Elizabeth Griesi. Griesi was then Irizarry's girlfriend. Irizarry explained to Griesi: "No spic is going to rob me and I'm going to make an example." App. at 3736.

Irizarry's crime spree ended when he was arrested on May 25, 2000. He told one of the arresting officers: "[y]ou could run, but you can't hide." App. at 3932.

## II.  PROCEDURAL HISTORY

Following Irizarry's arrest, a grand jury returned a nine-count second superseding indictment against Durso,

Irizarry and Bakhoury. Irizarry was charged in seven of the nine counts. Count One charged Durso, Irizarry and others with conspiring to participate in the affairs of an enterprise through a pattern of racketeering activity and the collection of an unlawful debt, in violation of 18 U.S.C. § 1962(d); Count Two charged Durso and Irizarry and others with participating in the affairs of an enterprise through a pattern of racketeering activity and the collection of an unlawful debt, in violation of 18 U.S.C. § 1962(c) (the "RICO counts"); Count Three charged Durso, Irizarry, Bakhoury and others with conspiring to distribute and possess with the intent to distribute 500 grams or more of cocaine, contrary to 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii), in violation of 21 U.S.C. § 846; Count Four charged Durso and Irizarry with conspiring to collect debts by extortionate means, in violation of 18 U.S.C. § 894; Count Five charged Durso and Irizarry with conspiring to commit arson and committing arson affecting interstate commerce, in violation of 18 U.S.C. §§ 844(i) and (2); Count Six charged Durso, Irizarry and others with the murder of Jose Ruiz in aid of racketeering in violation of 18 U.S.C. §§ 1959 and 2; and Count Seven charged Irizarry with the use of a firearm in a crime of violence, i.e., the murder of Jose Ruiz, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2.

Following a trial on all of these charges, a jury returned a special verdict finding Irizarry guilty on all counts.[2] The jury found that the government had proven twelve of the thirteen racketeering acts charged in the two RICO counts. Irizarry was thereafter sentenced to life imprisonment on Counts One, Two and Six, concurrent prison terms of 240 months were imposed on Counts Four and Five; and a prison term of 480 months was imposed on Count three.

---

2. Bakhoury pled guilty to Count Three, conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine, on April 23, 2001. Durso pled guilty to Count One, RICO conspiracy, and also agreed that he committed two of the thirteen predicate racketeering acts set forth in the indictment, viz., act 10, conspiracy to collect debts by means of extortion, and act 11(b), the arson of 214 Belvidere Avenue, in Jersey City, New Jersey. The other crew members, Soto, Looney, Sammartino and Farrell, were charged in separate indictments and subsequently pled guilty to the charges in the indictments.

The court also imposed a consecutive sentence of 60 months on Count Seven. This appeal followed.

## III. DISCUSSION

Irizarry asserts six claims of error. First, he argues that the government failed to prove the existence of a single ongoing enterprise and that it therefore improperly joined separate and unrelated crimes for trial. Second, that there was insufficient evidence to support the jury's finding that four murders charged as predicate acts were related to the affairs of the enterprise. Third, that the district court committed plain error by failing to instruct the jury that motive was a necessary element of the offenses charged in the indictment. Fourth, that the district court abused its discretion in admitting evidence of uncharged crimes to prove the RICO enterprise alleged in the indictment. Fifth, that the district court abused its discretion in denying a requested continuance. Lastly, he argues that the district court's failure to find prosecutorial misconduct was an abuse of discretion. We will address each assignment of error separately.

### A. Failure to Prove a Single Enterprise Resulting in Improper Joinder.

The Racketeer Influenced and Corrupt Organizations Act makes it

> unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). RICO also criminalizes a conspiracy to do any of these unlawful acts. 18 U.S.C. § 1962(d). To establish a § 1962(c) RICO violation, the government must prove the following four elements: "(1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated in, either

directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that he or she participated through a pattern of racketeering activity." *United States v. Console*, 13 F.3d 641, 652-653 (3d Cir. 1993).

RICO defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group or individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has explained that an enterprise "is an entity separate and apart from the pattern of activity in which it engages," and that its existence is proven "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). In *United States v. Riccobene*, 709 F.2d 214, 222 (3d Cir. 1983), *overruled on other grounds by Griffin v. United States*, 502 U.S. 46 (1991)

> we construed *Turkette* to require proof of each of the three sub-elements referred to by the Court in this passage, thus requiring the Government to prove: (1) that the enterprise is an ongoing organization with some sort of framework for making or carrying out decisions; (2) that the various associates function as a continuing unit; and (3) that the enterprise be separate and apart from the pattern of activity in which it engages.

*United States v. Pelullo*, 964 F.2d 193, 211 (3d Cir. 1992) (citing *Riccobene*, 709 F.2d at 221-224). "These three issues are questions of fact which, in the first instance, must be resolved by the jury." *Riccobene*, at 222. "[A]lthough the proof used to establish the existence of an enterprise and a pattern of racketeering may in particular cases coalesce, proof of a pattern of racketeering activity does not necessarily establish the existence of an enterprise." *United States v. Console*, 13 F.3d at 650 (citation and internal quotations omitted). Nevertheless, "in the appropriate case, the enterprise can be inferred from proof of the pattern." *Id.* at 650 n.5 (citation omitted).

Irizarry claims that the "government improperly joined for trial separate unrelated crimes since it failed to prove the

existence of a single ongoing criminal enterprise." Irizarry's Br. at 31. He argues that the government "join[ed] in one trial a number of separate crimes allegedly committed by [him] over the course of many years and involving many different unrelated individuals." *Id.* at 43. He claims that, since the government failed to prove the existence of a single enterprise, "the joinder of separate crimes and coconspiracies into one criminal trial was inherently unfair," and a new trial is required on all of the counts of conviction. *Id.* at 44.

Irizarry's argument conflates two related but distinct legal claims. He conflates the issue of joinder under Fed. R. Crim. P. 8 with the issue of whether the government proved the existence of a single RICO enterprise. Nevertheless, in an overabundance of caution, we will address the claim he is actually raising as two separate claims, one based on Fed.R.Crim.P. 8, and one based on whether the government proved the existence of a single RICO enterprise.

### (i).   Improper Joinder.

To the extent that Irizarry is arguing that there was an improper joinder, his argument is without merit.[3] Federal Rule of Criminal Procedure 8 governs joinder of offenses and joinder of defendants. It states:

---

3. Irizarry's counsel filed a pre-trial motion to "sever counts of the Indictment on the grounds that the Government was simply alleging a number of separate unrelated crimes not part of single enterprise." Irizarry's Br. at 33. The district court denied that motion without prejudice. The "denial of severance is committed to the sound discretion of the trial judge." *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir. 1991) (citation omitted). In his Reply Brief, at 4, Irizarry says that we should decide whether the district abused its discretion in denying his severance motion. However, that issue is not set forth in his Statement of Issues Presented On Appeal and is not pursued in the argument section of his brief. Therefore, it is waived. *Lunderstadt v. Colafella*, 885 F.2d 66, 78 (3d Cir. 1989) (a "casual statement" cannot serve to preserve an issue on appeal where it is contained in neither the statement of issues on appeal nor the argument section of the brief). However, since we conclude that the evidence was sufficient to establish a RICO enterprise, it follows that the district court did not abuse its discretion in denying Irizarry's requested severance.

**(a) Joinder of Offenses.** The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged — whether felonies or misdemeanors or both — are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

**(b) Joinder of Defendants.** The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

Fed.R.Crim.P. 8(a), (b). We make an "independent determination" as to whether or not there was an improper joinder of counts under Rule 8. *United States v. Somers*, 496 F.2d 723, 729 (3d Cir. 1974). If we determine that counts were improperly joined, we must undertake a harmless error analysis to see if prejudice resulted. *United States v. McGill*, 964 F.2d 222, 241 (3d Cir. 1992). Our inquiry into whether offenses or defendants were properly joined focuses upon the indictment, not upon the proof that was subsequently produced at trial. *Id.*

Irizarry's focus on Rule 8(b) at first appears misguided because Rule 8(b) authorizes joinder of *defendants* and Irizarry is actually challenging the joinder of allegedly unrelated *offenses*. Therefore, the plain language of Rule 8 suggests that he must rest his claim of misjoinder on Rule 8(a). However, we have held that Rule 8(a) "dealing with the joinder of offenses, applies only to prosecutions involving a single defendant" and that in a multi-defendant case such as this, "the tests for joinder of counts and defendants is merged in Rule 8(b)." *United States v. Somers*, 496 F.2d at 729 n.8. Moreover, most courts have held that Rule 8(b) applies exclusively to issues of joinder of multiple defendants and that Rule 8(a) applies only in cases involving a single defendant charged with multiple offenses. *See United States v. Eufrasio*, 935 F.2d 553, 570 (3d Cir. 1991) (citing *United States v. Kopituk*, 690 F.2d 1289, 1312

(11th Cir. 1982). Therefore, Irizarry's reliance on Rule 8(b) is proper.[4]

Count One, the RICO conspiracy count, charged that Durso, Irizarry and others, known and unknown, including members and associates of an international criminal organization known as, "La Cosa Nostra," constituted an enterprise whose principal purpose was to earn money through the commission of various crimes including murder, arson, robbery, cocaine distribution and the extortionate collection of "debts." Count One also charged that Durso, Irizarry and others conspired to commit at least two of thirteen racketeering predicates described in Count Two. Count One also described a cocaine distribution trade headed by Durso in which Irizarry was responsible for purchasing cocaine and delivering it to Durso and in which Irizarry conspired with Bakhoury to sell a quantity of cocaine.

Count Two, the RICO substantive count, charged that Irizarry, being employed by and associated with the enterprise, participated in the affairs of the enterprise through a pattern of racketeering activity which consisted

---

4. We did suggest in *Eufrasio* that Rule 8(a) might be the correct standard for the joinder of multiple offenses against one defendant, even in a case involving multiple defendants. We noted in *dicta* that "contrary to the jurisprudence in other circuits, when a joinder of offenses charged against the same defendant is challenged, the literal meaning of the Rule requires the application of Rule 8(a), irrespective of whether multiple defendants are involved in the case." *Eufrasio*, 935 F.2d at 570 n.20. However, we did not resolve the question of which Rule applied when a defendant in a multi-defendant case challenges the joinder of offenses in an indictment, because the results of our analysis would have been the same under Rule 8(a) or 8(b). *Id.* at 570.

The difference between the standards is significant. Although the standards of Rule 8(a) and Rule 8(b) are similar, in that they both require a "transactional nexus" between the offenses or defendants to be joined, Rule 8(a) is more permissive than Rule 8(b) because Rule 8(a) allows joinder on an additional ground, i.e., when the offenses "are of the same or similar character." *Eufrasio*, at 570 n.20 (quoting Fed.R.Crim.P. 8(a)); *see also United States v. McGill*, 964 F.2d 222, 243 (3d Cir. 1992) (referring to the "stricter, 'same act or transaction' standard of Rule 8(b)").

of: the conspiracy, attempt and murder of Giancarlo Ravasi (racketeering act one); the murder of Joseph Marmora (racketeering act two); the murder of Antonio Pavone (racketeering act three); the murder of Kyle Veale (racketeering act four); conspiracy to commit arson and the arson of a vehicle (racketeering act five); conspiracy to commit armed robbery of an armored car (racketeering act six); extortionate debt collection (racketeering act seven); attempted robbery and robbery of a delicatessen (racketeering act eight); cocaine distribution conspiracy (racketeering act nine); conspiracy to collect debts by means of extortion (racketeering act ten); conspiracy to commit arson and arson of a residence located at 214 Belvidere Avenue, Jersey City (racketeering act eleven); conspiracy to commit arson and arson of a residence located at 293 Sherman Avenue, Jersey City (racketeering act twelve); and the murder of Jose Ruiz (racketeering act thirteen).

Count Three charged Durso, Irizarry and Bakhoury with conspiracy to distribute and possess with intent to distribute 500 grams or more of cocaine. Count Four charged Durso and Irizarry with conspiracy to collect debts by extortionate means. Count Five charged Durso and Irizarry with conspiracy to commit arson and arson affecting interstate commerce. Count Six charged Durso and Irizarry with the murder of Jose Ruiz in aid of racketeering. Count Seven charged Irizarry with the use of a firearm in a crime of violence, i.e., the murder of Ruiz.

This case is unique in that Irizarry, a defendant in a multiple defendant RICO prosecution, is challenging the joinder of offenses and not his joinder with other RICO defendants. Nevertheless, we believe that the analysis in cases where we have upheld the joinder of RICO defendants is helpful to our inquiry. For example, in *Eufrasio*, three defendants, Santo Idone, Mario Eufrasio and Gary Iacona were found guilty of RICO violations (both substantive and conspiracy), attempted extortion, and illegal gambling. 935 F.2d at 557. Eufrasio's and Iacona's RICO liability was predicated on attempted extortion, illegal video poker machine gambling and collecting unlawful debts. However, Idone's RICO liability was predicated on attempted extortion

and on a separate murder conspiracy that did not involve Eufrasio or Iacona. *Id.* at 558.

Eufrasio and Iacona argued that their joinder as defendants with Idone violated Rule 8(b) because they were not connected with, or even aware of, the murder conspiracy predicate charged against Idone. Their joinder with him allegedly prejudiced them because the murder charged against Idone "infected the entire trial with evidence of uncharged Mafia crimes and the murder conspiracy itself." *Id.* at 566. They also alleged that the joinder "exposed the jury to evidence of numerous mob murders and attempted murders related to [Idone's] murder conspiracy and [a] . . . mob war" that had nothing to do with them. *Id.* at 567.

In rejecting this claim, we noted:

> Rule 8(b) provides substantial leeway to prosecutors who would join racketeering defendants in a single trial. The rule permits joinder of defendants charged with participating in the same racketeering enterprise or conspiracy, even when different defendants are charged with different acts, so long as indictments indicate all the acts charged against each joined defendant (even separately charged substantive counts) are charged as racketeering predicates or as acts undertaken in furtherance of, or in association with a commonly charged RICO enterprise or conspiracy. *United States v. Dickens*, 695 F.2d 765, 778-79 (3d Cir. 1982), *cert. denied*, 460 U.S. 1092 (1983). "[J]oinder . . . of a conspiracy count and substantive counts arising out of the conspiracy [is permitted], *since the claim of conspiracy provides a common link*, and demonstrates the existence of a common scheme or plan." *United States v. Somers*, 496 F.2d 723, 729-730 (3d Cir.) (emphasis in *Somers*, quoting Wright and Miller, *Federal Practice and Procedure* § 144), *cert. denied*, 419 U.S. 832 (1974).

935 F.2d at 567. Moreover, we agreed with the view of the Court of Appeals for the Second Circuit announced in *United States v. Friedman*, 854 F.2d 561 (2nd Cir. 1988).[5]

---

5. In *Friedman*, the court wrote:

> The mere allegation of a conspiracy presumptively satisfies Rule

There, the court held that a RICO conspiracy charge provides the required link to which we referred in *United States v. Somers. Eufrasio*, 935 F.2d at 567.

After reviewing the indictment in that context, we concluded that the strictures of joinder set forth in Rule 8(b) had not been violated by charging Idone with the murder conspiracy predicate, but not charging Eufrasio and Iacone "because, consistent with the law of joinder in RICO cases, all the criminal acts charged against each defendant, including the murder conspiracy implicating Idone, were undertaken in furtherance of a single, commonly charged racketeering enterprise and conspiracy." *Id.*

Applying the *Eufrasio* rationale here, we conclude that the superceding indictment did not improperly join separate, unrelated crimes allegedly committed by Irizarry. Rather, he was charged with a RICO substantive violation and a RICO conspiracy violation, and all of the criminal acts charged against him in the superceding indictment were charged either as predicates for the racketeering charge, or as acts undertaken in furtherance of a commonly charged RICO enterprise. Therefore, the second superseding indictment satisfies the "same act or transaction" requirement of Rule 8(b).

Moreover, Rule 8(b) permits the joinder of RICO and non-RICO counts in one indictment where the offenses charged

8(b), since the allegation implies that the defendants named have engaged in the same series or acts or transactions constituting an offense. The presence of a substantive RICO count under 18 U.S.C. § 1962(c), and of a RICO conspiracy count under 18 U.S.C. § 1962(d), further broadens the government's power to charge multiple defendants together. A RICO charge under § 1962(c) necessarily incorporates allegations that each of the defendants named was associated with or employed by the same enterprise, and participated in the enterprise by engaging in at least two acts of racketeering related to the enterprise. In short, by loosening the statutory requirements for what constitutes joint criminal activity, Congress limited the force of Rule 8(b) in such situations.

854 F.2d at 561 (quoting *United States v. Castellano*, 610 F.Supp. 1359, 1396 (S.D.N.Y. 1985)).

in the non-RICO counts are "also charged as racketeering predicates in the RICO counts." *Eufrasio*, 935 F.3d at 570. That is precisely what the second superseding indictment does. The non-RICO counts, i.e., Counts Three, Four, Five, Six and Seven, charged Irizarry with violations of the same criminal acts charged as racketeering predicates in the RICO counts, Counts One and Two. The same evidence needed to prove the racketeering predicates in the RICO counts also prove the charges in the non-RICO counts. Consequently, all of the criminal conduct charged against Irizarry constituted a series of related acts in furtherance of the commonly charged RICO enterprise and conspiracy, and there was no misjoinder of separate, unrelated offenses.

### (ii). Government's Failure to Prove the Existence of a Single, Ongoing Criminal Enterprise.

Irizarry claims that the government initially posited a larger RICO enterprise whose leader and chief lieutenants were organized crime figures. However, according to Irizarry, the government abandoned the original enterprise theory during the trial and argued that the enterprise consisted of Duso, Irizarry and underling crew members when the government realized it could not prove the enterprise it had charged in the indictment.

In pre-trial proceedings, Irizarry moved to dismiss the indictment or, in the alternative, to sever the counts of the indictment. The motion was based upon Irizarry's claim that the government was alleging a number of separate, unrelated crimes and conspiracies that were not a single enterprise. He also requested that the government proffer the structure and hierarchy of the alleged enterprise. Although the district court denied Irizarry's motions, during oral argument the government agreed to supply defense Irizarry's counsel with a list of co-conspirators. Accordingly, several days before the trial, the government gave counsel a list of forty-four co-conspirators. Irizarry claims that the forty-four co-conspirators were individuals the government intended to prove were members of the RICO enterprise. The government's list included co-conspirators Massimo Ranieri, Anthony Rotolo and Rocco Errico. Ranieri, Rotolo

and Errico are allegedly involved with organized crime. Looney testified Durso told him that Ranieri was a "made member" of the Mafia. App. at 3000-01. Another of the government's witnesses, Anthony Persichetti, testified that Ranieri was a high ranking member of the Lucchese crime family and an associate of the Gambino crime family. App. at 3330, 3337. However, McGuiness testified that Durso told him that Ranieri was a high ranking member of the Gambino crime family and was heir apparent to the Sicilian wing of the Gambino crime family. App. at 3166, 3167. Irizarry claims that Rotolo and Errico work for Joseph "Pepe" LaScala, who is allegedly a member of the Genovese crime family. Irizarry's Br. at 36. LaScala appears on the list of co-conspirators the government tendered to Irizarry.

Irizarry argues that the government went to trial under the theory that Ranieri was the head of the enterprise and that Rotolo and Errico were high ranking members. As proof of that claim, Irizarry points to the government's opening statement:

> Many witnesses will get up here and say Durso was Elvis' boss. Elvis worked for Durso and the evidence is going to show past criminal jobs came down often through Durso to Elvis Irizarry.

> \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

> You're going to hear the name Massimo Ranieri. Massimo Ranieri is someone Durso answered to.

> You have Massimo Ranieri and you have Durso and you have Irizarry and people with whom they worked.

> Obviously you'll hear about the overall situation in which these crimes were committed, but you'll hear at great length the individual crimes that were committed.

App. at 950-952. Irizarry also notes that Durso had to pay a weekly "tribute" of $500 to $600 to Ranieri, App. at 3198-99, and that Durso admitted to McGuiness that Ranieri was his boss. App. at 3166-68. Irizarry even testified that Ranieri was "the boss . . . he was the man."

However, Irizarry argues that the government could not establish that Ranieri was behind all of the criminal activity

charged in the indictment and that the evidence failed to tie Ranieri to Irizarry on the one hand, and to Rotolo and Errico on the other. According to Irizarry, the government therefore pulled a prosecutorial "bait and switch" well into the trial. Irizarry claims that the prosecution began alleging that the enterprise actually consisted of Durso, Irizarry and the crew and that the Durso-Irizarry enterprise, at various times, engaged in criminal activities for Ranieri on the one hand and for Rotolo and Errico on the other hand. In Irizarry's telling, the fact that the government changed its position as to the composition of the enterprise and then claimed that the Durso-Irizarry enterprise engaged in criminal activities for Ranieri, Rotolo and Errico shows that the government was joining in one trial a number of separate, unrelated crimes involving many different individuals that Irizarry allegedly committed over the course of many years. Thus, he claims that the government failed to establish one RICO enterprise that was responsible for all of the acts charged to Irizarry. Irizarry further argues that because the government joined in one trial a number of separate, unrelated crimes that he allegedly committed with other individuals over the course of many years, the testimony the government elicited about Ranieri's, Rotolo's and Errico's criminal activities was both highly prejudicial and inadmissible.

The government of course denies that it changed horses midstream by redefining the enterprise during trial. It argues that it never alleged that Ranieri was the head of the charged RICO enterprise. The government notes that the second superseding indictment charged a criminal enterprise consisting of "defendants Franco Durso, Elvis Irizarry and others." App. at 50. Neither Ranieri nor Rotolo nor Errico are named in the second superseding indictment. The government argues that it properly charged, and proved beyond a reasonable doubt, that at various times throughout its existence, the Durso-Irizarry enterprise worked for and with other individuals, including various associates of organized crime. Specifically, the indictment alleged that "members or associates of an international criminal organization known to its members as La Cosa Nostra (this thing of ours) . . . at various times, directed, approved, conspired in, and profited from the

criminal activities . . . committed by members of the enterprise." App. at 51. The government claims that Ranieri, Rotolo and Errico are the members of La Cosa Nostra who conspired with the enterprise to commit several of the charged racketeering predicates.[6] However, argues the government, the fact that Ranieri, Rotolo and Errico conspired with the enterprise to commit several of the racketeering predicates does not make them members of the enterprise they conspired with.[7] On the contrary, claims

6. The racketeering predicates that Ranieri, Rotolo and Errico are alleged to have conspired with the enterprise to commit are Racketeering Act Six (conspiracy "to commit a robbery of an armored car involved in the transportation of money to and from Kingsbrook Jewish Medical Center in Brooklyn), and Racketeering Act Ten (conspiracy "to participate in the use of extortionate means, that is, means involving the use of express and implicit threats of violence, to collect and attempt to collect extensions of credit.").

7. Congress's purpose in enacting RICO was to eradicate organized crime by "bring[ing] the often highly diversified acts of a single organized crime enterprise under RICO's umbrella." *Eufrasio*, 935 F.2d at 566. Accordingly, "separately performed, functionally diverse and directly unrrelated predicate acts and offenses will form a pattern [of racketeering] under RICO, as long as they all have been undertaken in furtherance of one or another varied purposes of a common organized crime enterprise." *Id.* Moreover, a RICO enterprise may engage in a pattern of racketeering activity that consists of separate and distinct conspiracies. *United States v. Pungitore*, 910 F.2d 1084, 1099-1101, 1134-35 (3d Cir. 1990). The government can prosecute a series of different conspiracies in a single RICO count so long as all of the different conspiracies relate to the affairs of a single enterprise. *Riccobene*, 709 F.2d at 224-25. As we have said, "Congress intended that a series of agreements that under pre RICO law would constitute multiple conspiracies could under RICO be tried as a single enterprise conspiracy if the defendants have agreed to commit a substantive RICO offense." *Id.* (citation and internal quotations omitted); *see also United States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir. 1984) ("[A] RICO conspiracy under 18 U.S.C. § 1962(d), supported by predicate acts of racketeering activity that in themselves are conspiracies" does not "violate the principle of *Kotteakos v. United States*, 328 U.S. 750 (1946), which prohibits conviction of multiple conspiracies under an indictment charging a single conspiracy.").

However, "the RICO conspiracy and the predicate conspiracy are distinct offenses with entirely different objectives." *Pungitore*, 910 F.2d at

the government, the enterprise, as charged and proven, had a defined framework, headed by Durso and composed of Irizarry and the underling members of the crew. This enterprise was shown to function as a continuing unit which committed crimes on its own and which conspired with others, including members of organized crime, to

1135. "[T]he objective of a RICO conspiracy is to assist the enterprise's involvement in corrupt endeavors," whereas the "objective of the predicate conspiracy is confined to the commission of a particular substantive offense." *Id.* (citation and internal quotations omitted). Because of this distinction, a person may join a predicate conspiracy and agree to commit a substantive offense but not be RICO co-conspirator and not commit a substantive RICO offense. In *Riccobene*, the RICO enterprise was a Philadelphia crime family. 709 F.2d at 216, 224. Of the eight racketeering predicates charged, three were connected with the enterprise's dealings with a car dealership. *Id.* at 217. The dealership's general manager testified that he borrowed money from a member of the RICO enterprise and then agreed to lend it to someone else "at unlawfully high interest rates." *Id.* at 217-18. When the borrower could not repay the loan, the general manager and the enterprise threatened him. *Id.* at 218. The threat "was the basis for the racketeering acts of extortionate credit and unlawful debt collection" against one of the members of the enterprise. *Id.* The general manager and the enterprise also agreed to fake a robbery at the dealership so that the general manager could collect money from the dealership's insurance carrier and pay off his debts to the enterprise. As part of the scheme, the general manager agreed to give a car free of charge to a member of the enterprise and alter the dealership's books to show that the enterprise member paid cash for the car. *Id.* This scheme was "the basis for the mail fraud claim against [the enterprise] as a predicate offense to the RICO conspiracy." *Id.*

Although the general manager conspired with enterprise members to commit substantive predicate offense, he was not a member of the Philadelphia crime family and was not charged with a RICO substantive offense or a RICO conspiracy offense. He was charged, however, in a separate indictment. *See United States v. Brown*, 583 F.2d 659. He was convicted of extortionate debt collection and conspiracy to commit extortionate debt collection for the part he played in borrowing, lending and collecting money and of mail fraud for staging the robbery at the dealership. Nonetheless, evidence regarding the general manager's criminal activity with the enterprise was relevant to and admissible against the RICO defendants because he had participated with them in committing three racketeering predicates.

commit crimes on their behalf.[8] As the government puts it, "[T]he enterprise functioned as an independent contractor that was willing, ready and able to perform criminal tasks for other criminals." Government's Letter Br. at 2-3.

In order to resolve these conflicting theories on the roles allegedly played by Ranieri, Rotolo and Errico, we must examine the testimony about key individuals involved in Irizarry's criminal activities in some detail.

### (1).  Massimo Ranieri.

There were thirty-one references to Ranieri during the government's case-in-chief. Each is listed separately below.

1.  Fabio Ravasi testified that he visited a man named "Massimo" to deliver money on behalf of his father, Giancarlo Ravasi. App. at 1093. Giancarlo Ravasi's murder was charged as racketeering act one;

2.  Sammartino testified that after the Marmora murder (racketeering act two) Irizarry threatened Sammartino by telling him that if he said anything about the murder, he would end up dead. Sammartino also testified that Irizarry "made references to an old man." App. at 1458-59. Sammartino later testified that "the old man" is a reference to Ranieri. App. at 1578;

3.  Sammartino testified that Irizarry told him "[t]hat the old man was highly connected, and that he was powerful and working with him, we could make a lot of money." App. at 1461;

4.  Sammartino testified that when Irizarry recruited him for the armored car robbery at the Jewish Medical

---

8. The government claims that the Durso-Irizarry enterprise did not just conspire with organized crime figures to commit crimes on their behalf, but also conspired with others. As examples, the government noted that Laviola conspired with Durso to have the enterprise burn down Laviola's house in exchange for $2,000 to $5,000. Irizarry and Looney carry out the aforementioned arson. Later, a person named "Red" contacted Durso because Red wanted to have his house burned down. Durso agreed and had Irizarry, Looney and Gary Biase, Looney's friend, burn down Red's house.

Center in Brooklyn (racketeering act six) Irizarry stated that the "old man" thought "this is a good thing." App. at 1467;

5. Sammartino testified that Ranieri was present during a discussion about the armored car robbery at the Jewish Medical Center. App. at 1578;

6. Sammartino testified that he saw Ranieri at Durso's pizzeria around 1993. App. at 1578-79;

7. Pierce testified that Durso once told him that Ranieri was Durso's godfather — in a "religious" context — and that he noticed that Durso "was very respectful toward[ ] him." App. 1597-98;

8. Pierce testified that Irizarry referred to Ranieri as "the boss; that he was the man." App. at 1600;

9. Pierce testified that when Ranieri was going to visit Durso's pizzeria, the employees "had to clean up the pizzeria . . . [and] were told to leave." App. at 1601;

10. Pierce testified that he once drove Durso to Brooklyn to meet with Ranieri, but that he did not know what the meeting was about. App. at 1603-05;

11. Farrell testified that he once saw Ranieri at Durso's pizzeria. App. at 2750-51, 2891;

12. Farrell testified that he once accompanied Irizarry to Brooklyn to meet with Ranieri. App. at 2752-53;

13. Looney testified that Durso told him that he borrowed money from Ranieri to open a club in Manhattan. App. at 3000;

14. Looney testified that he once saw Ranieri at Durso's pizzeria. He also testified that Durso told Looney that Ranieri "was never to know that Franco [Durso] or anybody, even Elvis, was involved in drugs ever." App. at 3001-02, 3128;

15. Looney testified that numerous phone calls were made to and from Durso's bar between Durso and Ranieri. App. at 3003;

16. McGuinness testified that Durso told him that Ranieri "was his boss and he was next in line to take

over the group" — "the Sicilian wing of this family, the Gambino family." App. at 3167;

17. McGuinness testified that Durso told him that "Franco [Durso] ran the show here [New Jersey] for him [Ranieri]"; "[t]hat he [Durso] worked for Massimo [Ranieri]." App. at 3168;

18. McGuinness testified that Durso sent a "tribute" of $500-$600 to Ranieri each week; a tribute is "[w]hen you pay somebody to look over you . . . [o]n disputes and stuff." App. at 3197-98;

19. McGuinness testified that he once approached Durso because a man he knew, as "Timmy," had gotten "stiffed" on a bet he made "with some bookmaker in New York." In response, Durso brought McGuinness and Timmy to meet Ranieri in Brooklyn. Ranieri spoke with Timmy alone and "[a] few days later [Timmy] got his money." App. at 3201-03;

20. Persichetti testified that he met Ranieri when he was 16 years old and that the two developed a "very close" criminal relationship. App. at 3324;

21. Persichetti testified that the first crime Ranieri ever asked him to do was "to go to Syracuse and kill somebody" in 1982; he did it. He explained that it had to do with "something about money." App. at 3325-29;

22. Persichetti testified that he believed Ranieri was in the Lucchese crime family. App. at 3330;

23. Persichetti testified to making a bomb with Ranieri to blow up a laundromat. App. at 3331-34;

24. Persichetti testified to visiting a pizzeria owner with Ranieri to collect money through extortionate means. App. at 3332;

25. Persichetti testified that Ranieri was friends with John and Joe Gambino of the Gambino crime family. App. at 3337;

26. Persichetti testified that Ranieri once asked him to burn down a pizzeria in Brooklyn, but they never followed through with it. App. at 3339;

27.  Persichetti testified that he extorted money on behalf of Ranieri. App. at 3339-40;

28.  Persichetti testified that Ranieri was a regular patron of Café Venezia in Brooklyn, Café Sicilia in Queens, Café Italia in Queens and Vinnie's Café in Ridgfield. App. at 3345-47;

29.  Persichetti testified that in 1992, Ranieri introduced him to a friend, Joseph Marmora. Persichetti recalled that Marmora was interested in buying a gun and over time it seemed as if Marmora was getting to know more and more people in Brooklyn. App. at 3349-52;

30.  Persichetti testified that in the late 1980s, Ranieri and he stopped being as close as they had been because Persichetti joined the Gambino crime family and that Persichetti was not interested in joining that family. As a result of Persichetti's association with the Gambino crime family, he was doing less work with Ranieri. App. at 3353-55; and

31.  Persichetti testified that he often saw Durso with Ranieri. App. at 3358.

### (2).  Anthony Rotolo.

There were four references to Rotolo during the government's case-in-chief. First, Farrell testified that Irizarry said that he collected money for Rotolo. App. at 2761. Second, Looney testified that he also collected money for Rotolo. App. at 2965-66. Third, Looney testified that John Yengo "[o]wed money to Franco [Durso], . . . The Guinea [i.e., Rotolo], . . . [and] Mike Scurti." App. at 2989-90. Looney explained that when Yengo received a settlement check and paid only Scurti, Irizarry "beat[ ] his ass." App. at 2989-90. Fourth, while explaining that Durso lent money on his behalf, McGuiness testified that Durso told him he also "got money from Tony [Rotolo]." App. at 3195-96. Although McGuiness could not say "for sure" that Rotolo lent money through Durso, he did testify that Durso told him, "Yeah, I got money from Tony." App. at 3195-96.

### (3). Rocco Errico.

There were three references to Errico during the government's case-in-chief. A man named "William Garretson" testified that Errico was involved in illegal gambling. App. at 2900. Garretson testified that in late 1998, he owed approximately $36,000 to Errico but was unable to pay.[9] App. at 2905-06. Consequently, Errico and Irizarry paid Garretson a visit. App. at 2906. During that encounter, Errico told Garretson that, from now on, Garretson should make his weekly payments to Irizarry. App. at 2906-07. From late 1998 until approximately May 2000, Irizarry collected the debt. App. at 2907-08.

Second, Garretson's cousin, Vito Goglucci, testified that he borrowed $6,000 from Errico in 1996 to help Garretson pay his debt to Errico. App. at 2932-36. For about one year, Goglucci made the payments on the loan, but then transferred responsibility for repayment to Garretson. App. at 2936-37. In late 1998, Errico contacted Goglucci because Garretson was not making the payments. App. at 2937-38. Errico told Goglucci that he would have to start making payments on the $8,000 balance and that "someone new" would be collecting the money. App. at 2938-39. Irizarry then contacted Goglucci and began collecting the payments. App. at 2940.

Third, while explaining that he gave money to Durso for Durso to lend out on his behalf, McGuinness testified that Durso told him "he borrowed money from Rocky [Errico]." App. at 3195-96.

As noted, Irizarry's claim is that the government initially began this prosecution under the theory that Ranieri headed the RICO enterprise and that Rotolo and Errico were high-ranking members. Irizarry contends that after all of the testimony about Ranieri, Rotolo and Errico was elicited, it became apparent to the government that it could not prove any connection between Ranieri on the one hand, and Rotolo and Errico on the other. Consequently,

---

9. Garretson's debt was originally incurred in 1996. It was a gambling debt that he owed to a sports bookmaker named Enrico Zamora. However, Zamora transferred the debt to Errico. App. at 2905.

according to Irizarry, the government switched its enterprise theory and posited a smaller enterprise that was composed of Durso, Irizarry and the crew.

However, our examination of the record does not support Irizarry's claim. As the government has pointed out, Ranieri, Rotolo and Errico are not even named in the second superseding indictment.[10] Irizarry's contention that the government alleged that Ranieri was the head of the enterprise and that Rotolo and Errico were high-ranking members is, we believe, based on his misunderstanding of the government's overarching theory of the case. Admittedly, Ranieri, Rotolo and Errico were on the list of co-conspirators the government provided before trial. However, the fact that the government regarded them as co-conspirators in a RICO prosecution does not mean that the government alleged that Ranieri was the head of an enterprise or that Rotolo and Errico were his lieutenants. On the contrary, the government's theory was that the Durso-Irizarry enterprise conspired separately and at different times with Ranieri, Rotolo and Errico to commit crimes on behalf of Ranieri, Rotolo and Errico. In other words, the government alleged that the Durso-Irizarry enterprise conspired separately with Ranieri, Rotolo and Errico to commit several of the charged racketeering predicates.[11] Irizarry's claim that the government changed its enterprise theory *in media res* is simply a reflection of his failure to realize that the government can prosecute a series of different predicate conspiracies in a single RICO count. This can include persons who are not members of the enterprise, but who conspire with the enterprise to commit predicate offenses as long as the predicate conspiracies relate to the affairs of a single RICO enterprise. *See* n.6, *supra.*

Thus, if the predicate conspiracy relates to the affairs of a RICO enterprise, it can be charged as part of that

---

10. Of course, the fact that they are not named is not necessarily a point in the government's favor as it could support Irizarry's claim that the government improperly elicited testimony regarding individuals without connecting him to them through proof of the scope of the enterprise.

11. *See* n.5, *supra.*

enterprise's pattern of racketeering activity in a RICO prosecution even though not all co-conspirators are actually members of the charged RICO enterprise. *See Pungitore*, 910 F.2d at 1134-35. Since proof of a pattern of racketeering activity (i.e., proving two or more racketeering acts, 18 U.S.C. § 1961(5)), is necessary to establish a RICO violation, *see Console*, 13 F.3d at 652-653, evidence of co-conspirators in a predicate conspiracy constitutes direct evidence of the charged offense and it is therefore admissible to prove the charged RICO violation. *See United States v. Cross*, 308 F.3d 320 & n.19 (3d Cir. 2003) (evidence of acts that directly prove the charged offense is "intrinsic" and admissible).

Here, the majority of the thirty-one references to Ranieri and all of the references to Rotolo and Errico related to their involvement with the charged RICO enterprise. Accordingly, to the extent that Irizarry is arguing that testimony about interactions with the Durso-Irizarry enterprise was inadmissible, that argument is without merit.

The government concedes that Ranieri was Durso's boss. However, that does not mean that the government originally attempted to prove that Ranieri was the boss of the charged enterprise. Although Durso may have been beholden to Raineri, the command structure and organization of the charged and proven enterprise consisted of Durso, as the head, Irizarry, as his lieutenant, and the rank and file members of the crew. Ranieri was apparently a powerful and highly-placed organized crime figure whose interests had to be protected and serviced by the Durso-Irizarry enterprise whenever Ranieri called upon it. It is in that sense that Ranieri was Durso's "boss."

As is evident from the summary we have set forth above, the majority of references to Ranieri during the government's case-in-chief directly related to his dealings with the Durso-Irizarry enterprise and are relevant to his relationship to Durso. This is exemplified by Fabio Ravasi's testimony that his father, Giancarlo Ravasi, owed money to Ranieri as set forth above. In the government's view, Fabio's testimony established a motive for Ranieri to hire the charged enterprise to murder Giancarlo Ravasi. Ranieri was

also mentioned as encouraging the enterprise's planned armored car robbery at the Jewish Medical Center in Brooklyn, and other testimony tied him to the Marmora murder. As noted above, Sammartino testified that, after that murder, Irizarry made references to "the old man," i.e., Ranieri, and warned that Sammartino would wind up dead if he said anything about the Marmora slaying.

In addition, Persichetti testified that Ranieri introduced him to Marmora and he recalled that Marmora wanted to do work for individuals in Brooklyn and that he was getting to know more people there. The government's theory is that Irizarry killed Marmora to eliminate the possibility that Marmora might compete with Ranieri and hurt Ranieri's business. These references to Ranieri were, therefore, also relevant to proving that he engaged in predicate conspiracies with the enterprise. Accordingly, the district court did not err in admitting that testimony.

Although Irizarry broadly argues that all references to Ranieri were inadmissible because the government changed its theory of the composition of the enterprise, his major complaint appears to center on those references to Ranieri that had nothing to do with Ranieri's direct dealings with the enterprise. He argues that such references were unduly prejudicial and that they denied him of a fair trial. Specifically, he now objects to the testimony the government elicited from various witnesses about Ranieri's ties to organized crime and the testimony from Anthony "Big Tony" Persichetti about Persichetti's own criminal activities with Ranieri.[12]

We are also troubled by the admission of evidence that was unrelated to any of Ranieri's dealings with the charged Durso-Irizarry enterprise. Persichetti testified that he engaged in a number of criminal activities with Ranieri beginning in 1980 and ending sometime in the late 1980s,

---

12. Irizarry claims that Persichetti is "an admitted murder and member of organized crime who had cooperated with the Government and testified in a number of prior federal prosecutions, and who was serving a lengthy prison term as a result of a prior plea negotiation." Irizarry's Letter Br. at 3. The government does not dispute Irizarry's characterization of Persichetti.

including murder, debt collection and arson.[13] Persichetti also testified that Ranieri was a high-ranking member of the Lucchese crime family and an associate of the Gambino crime family. Persichetti explained the structure and protocol of an organized crime family and testified that because of Ranieri's position in organized crime, Ranieri had meetings with other leaders and high-ranking members of organized crime families. Persichetti said that he began doing less work for Ranieri in the late 1980s after joining the Gambino crime family. According to Persichetta, Ranieri approached him and said that he wanted to get involved with the notorious John Gotti. Finally, Persichetti testified that he had only "heard of" Irizarry and did not know him personally. App. at 3320. McGuiness testified that Durso told him that Ranieri was a high-ranking member of the Gambino crime family and the heir apparent to the Sicilian wing of that family. Looney testified that Ranieri was a "made" member of the Mafia. None of this testimony had anything to do with Ranieri's interactions with the charged enterprise.

This evidence about Ranieri's criminal acts that are unrelated to the enterprise and to his connections to organized crime families could only serve to demonstrate that Irizarry was connected to criminals, and that, by inference, Irizarry was a criminal and an evil one at that. Such references are not only improper, they are prejudicial.[14]

However, Irizarry never objected to this evidence during trial. He did object to Persichetti being called as a witness,

---

13. As we noted earlier, Persichetti testified that he met Ranieri when he was 16 years old and that the two developed a "very close" criminal relationship; Persichetti testified that the first crime Ranieri asked him to do was "to go to Syracuse and kill somebody" in 1982; he testified to making a bomb with Ranieri to blow up a laundromat; and he testified to visiting a pizzeria owner with Ranieri to collect money through extortionate means.

14. Of course we recognize that, even by his own admission, Irizarry was an unsympathetic individual who was neither a model citizen, nor even a law abiding one. However, his trial was governed by the same rules that govern all criminal trials. Those rules impose carefully reasoned and articulated limitations on attorneys who are, after all, officers of the court.

but that objection was based upon the fact that Irizarry did not know Persichetti. The challenge Irizarry makes here, is being raised for the first time on appeal. Accordingly, we review only for plain error. *See* Fed.R.Crim.P. 52(b); *United States v. Oser*, 107 F.3d 1080, 1088 (3d Cir. 1997). In order to find plain error, we must find (1) an error (2) that is plain and (3) affects substantial rights. *United States v. Knobloch*, 131 F.3d 366, 370 (3d Cir. 1997) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)). In most cases, an error affects substantial rights if it is prejudicial, i.e., if it affected the outcome of the district court proceedings. *United States v. Barbosa*, 271 F.3d 438, 454 (3d Cir. 2001) (citation and internal quotations omitted). Moreover, the defendant bears the burden of demonstrating prejudice. *Id.* (citation omitted). Although it is within our discretion to correct the plain error, we do so only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Knobloch*, 131 F.3d at 370 (citation and internal quotations omitted).

Despite our belief that it was error to admit testimony about Ranieri that was completely unrelated to his dealings with the enterprise, and our concern for trial tactics underlying such testimony, we decline to find plain error because of the overwhelming evidence of Irizarry's guilt. Given the strength of that evidence, we conclude that the inadmissible evidence elicited from Persichetti did not seriously affect the fairness, integrity or public reputation of judicial proceedings.[15]

---

15. Despite our holding that the strength of the evidence against Irizarry defeats a claim of plain error, we find it necessary to once again caution against the dangers of eliciting this kind of evidence and the propriety of admitting it. The kind of visceral reaction that nearly all jurors will have to irrelevant references to such notorious figures as the members of the Gambino crime family can poison the deliberative well to an extent that will fatally undermine the integrity of any subsequent conviction. Such evidence serves only to unfairly tar a defendant in front of the jury. Moreover, "[a]lthough the government will hardly admit it, the reasons proffered to admit [such] evidence . . . is often mixed between an urge to show some other consequential fact as well as to impugn the defendant's character". *United States v. Sampson*, 980 F.2d 883, 886 (3d Cir.1992).

Finally, Irizarry appears to argue that it was improper for the government to cross-examine[16] him about his relationship to Ranieri once the government conceded that Ranieri was not a member of the alleged enterprise. However, as we have noted, the government never alleged that Ranieri was a *member* of the enterprise. Rather, the government's theory was that the enterprise conspired with Ranieri and committed crimes on Ranieri's behalf, and at his behest.

In any event, on cross-examination, Irizarry acknowledged that he was friendly with Ranieri, and that Irizarry had obtained legitimate employment for him. However, Irizarry insisted that he had not spoken to Ranieri in about fourteen months. There was nothing improper in this questioning because it directly pertained to charged activities of the enterprise even though Ranieri was not alleged to be a member of it. Moreover, evidence had already been introduced that showed that Irizarry and the enterprise engaged in criminal activities on Ranieri's behalf. Therefore, it was permissible for the government to inquire into Irizarry's relationship with Ranieri. *Cf. United States v.*

---

16. Irizarry also claims that the following exchange between the government and him during his cross-examination was improper:

Q:  You're the new Persichetti, aren't you?

A:  No.

Q:  What are you?

A:  No.

Q:  What are you?

A:  Absolutely No.

Q:  He went and you came in?

App. at 4389. Irizarry claims that though the transcript shows a question mark at the end of the last question, the government was making a declarative statement. We have no way of determining the truth of that allegation, and counsel for Irizarry did not object while these questions were being posed. Although the inquiry certainly appears inartful, it does not strike us as so prejudicial as to rise to the level of plain error. Moreover, Irizarry does not now suggest how this inquiry did prejudice him, or why it amounts to plain error.

*O'Leary*, 739 F.2d 135, 136 (3d Cir. 1984) (recognizing that even evidence of a defendant's and a witness's prior bad acts was admissible to show, *inter alia*, the defendant's familiarity with the witness).

Irizarry also argues that testimony the government elicited from various witnesses pertaining to Rotolo and Errico was inadmissible once the government realized it could not prove that they were high-ranking members of the charged enterprise. However, just as the government never charged that Ranieri was the head of the organization, the government never charged that Rotolo and Errico were high-ranking members of the organization. At the risk of redundancy, we again state that the government's theory was that the enterprise conspired with Rotolo and Errico to commit crimes on their behalf. Testimony pertaining to Rotolo and Errico was clearly related to their relationship to the enterprise, and was therefore admissible.

Farrell and Looney testified that Irizarry and Looney (both members of the enterprise) collected money for Rotolo. The relevance of that evidence is self evident. It established an activity of the criminal enterprise and the charged racketeering activity specifically included extortionate debt collection on behalf of the enterprise and others. Similarly, McGuinness's testimony that Rotolo gave money to Durso, and that Durso loaned money on behalf of others, supported a reasonable inference that the enterprise also provided loansharking services for Rotolo. As noted above, Looney testified that Yengo owed Durso, Rotolo, and Scurti money, and that he (Yengo) was beaten because he repaid someone other than Durso. This also established the enterprise's extortionate debt collection practices. Therefore, each of the references to Rotolo were relevant to his interactions with the enterprise.

In addition to the references to Rotolo by Farrell, Looney and McGuiness, the government also asked Irizarry about his relationship to Rotolo on cross-examination without objection. The questioning included an inquiry into whether Rotolo was a guest at Irizarry's wedding and whether Irizarry ever collected debts for Rotolo. Irizarry acknowledged that Rotolo was at his wedding and that he

knew that Rotolo was in the money-lending business, but denied that he collected debts for him.[17] The government's cross-examination of Irizarry regarding his knowledge of Rotolo's extortionate activities was relevant to establishing whether Irizarry had collected debts for him.[18] The relevance of Rotolo's presence at Irizarry's wedding is far more questionable given other testimony that established a relationship between the two. However, it was admitted without objection, and since it does support an inference that Rotolo trusted Irizarry, we can not conclude that it constituted plain error.

Irizarry argues that the testimony about Garretson's and Goglucci's debts to Errico was completely unrelated to Errico's relationship with the Durso-Irizarry enterprise. We disagree. This testimony shows that Errico availed himself of the activities of the enterprise. More specifically, it establishes that he used Irizarry to collect debts, and it is therefore evidence of the precise activity alleged in the indictment. Furthermore, McGuinness's testimony that Durso borrowed money from Errico was directly related to Errico's interactions with the enterprise. McGuinness testified that the enterprise loaned money on behalf of others. This testimony, coupled with Durso's statement that he borrowed money from Errico, supported the reasonable inference that the enterprise loaned money on behalf of Errico, and was therefore probative of the enterprise's criminal activities.

---

17. We agree that the inquiry into attendance at the wedding was questionable given the weight of more appropriate evidence that established a relevant nexus between Irizarry and Rotolo without the danger of tarring Irizarry with guilt by association. However, that testimony clearly does not constitute plain error.

18. The government also asked Irizarry whether he visited Rotolo because of threats Irizarry made to Mike Della Rosa, a union shop steward who worked with Irizarry at a construction site. Apparently, Irizarry was annoyed because Della Rosa was taking credit for getting Irizarry into the union, but Irizarry refused to give Della Rosa credit for it. Irizarry admitted that he spoke to Rotolo, but could not remember their conversation. Inquiry into this during cross-examination of Irizarry was additional evidence of the kind of relationship Irizarry had with Rotolo.

Finally, during cross-examination, the government asked Irizarry, without objection, about his friendship with Errico. Irizarry admitted that Errico was his best man at his wedding. He also admitted that he collected money for Errico as a favor, but denied knowing that there was interest involved or that the debt was illegal. Given the evidence that Irizarry and the enterprise carried out criminal activities on Errico's behalf, it was appropriate for the government to cross-examine Irizarry regarding his collection efforts on behalf of Errico. Moreover, as with the testimony regarding Rotolo's presence at Irizarry's wedding, we can not conclude that the court committed plain error in admitting testimony that Errico was Irizarry's best man.

For all of the above reasons, we find that Irizarry's claim that the government changed the theory of the enterprise after the trial began and prosecuted a number of separate, unrelated crimes that Irizarry committed over the course of the years with many separate individuals in one trial is without merit.

### B.  Insufficient Evidence to Support the Jury's Finding that All of the Murders Committed by Irizarry Related to the Affairs of the Enterprise.

The jury returned a special verdict sheet indicating that it found Irizarry guilty on all counts charged against him. The jury also found that the government had proven twelve of the thirteen racketeering predicate acts charged in the two RICO counts. The twelve RICO predicates included five murders. These were the murders of Ravasi, Veale, Ruiz, and the joint murders of the Marmora and Pavone. Irizarry does not challenge the sufficiency of the evidence to support the jury's findings that he committed the five murders. Nor does he challenge the sufficiency of the evidence to support any of the other racketeering predicates the jury found. Indeed, he does not even challenge the sufficiency of the evidence that the Ravasi murder and the seven other predicate racketeering acts were related to the enterprise. Instead, he argues that even if we reject his joinder argument under Rule 8, the government failed to

prove that the Marmora, Pavone, Veale and Ruiz murders were related to the affairs of the enterprise.[19]

His argument goes to the fourth element of a RICO charge. To establish that a defendant agreed to, or did, conduct or participate in the affairs of an enterprise through a pattern of racketeering, "the government must show that the [defendant] is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise; or . . . that the predicate offenses are related to the activities of that enterprise." *United States v. Jannotti*, 729 F.2d 213, 226 (3d Cir. 1984) (citation and internal quotations omitted).

Given Irizarry's role in the enterprise, we believe that the Marmora, Pavone, Veale and Ruiz murders clearly related to the affairs of the enterprise. The government charged and proved that the major purpose of the enterprise was "to earn money through the commission of, among other crimes, murder, arson, robbery, cocaine distribution, and the collection of debts through means of extortion." Second Superseding Indictment, App. at 50. Evidence of these murders clearly established that Irizarry's principle function in the enterprise was that of enforcer. Indeed, his overwhelming value to the enterprise was his "muscle." A review of the four challenged murders plainly demonstrates that all of them related to the affairs of the enterprise, and Irizarry's role in it.

### (i). The Veale murder.

Irizarry argues the Veale murder was not related to the affairs of the enterprise because there was no proof that

---

19. Ironically, Irizarry's argument can be viewed as a rather intriguing protestation of character assassination. He seems to be saying: "I may be a cold blooded killer, but I am no racketeer." This gives new meaning to Shakespeare's previously unchallenged observations about the nature of one's reputation. *See Othello*, Act III, Scene III. ("Good name in man and woman, . . . [i]s the immediate jewel of their souls: Who steals my purse steals trash . . . . But he that filches from me my good name [r]obs me of that which enriches him not, [a]nd makes me poor indeed.").

Durso "or anyone else in the alleged criminal enterprise" ordered the murder. Irizarry's Br. at 48. We disagree.

Irizarry loaned Veale $3,000 during the fall of 1993. The money came from "his guys," i.e., the "guys [Irizarry] was connected with down at [Carmine's]," which included Durso. App. at 2089. When Veale did not repay the money, Irizarry told Bakhoury to talk to Veale about the debt. App. at 2089-90. Around this same time, Bakhoury told Irizarry that Veale may have taken money out of a joint bank account that he and Veale had recently opened. App. at 2091. When Irizarry heard that Veale had taken money from the account, he told Bakhoury that he "should do something. Kick his ass. You got to do something." *Id.* Ultimately, Irizarry made Bakhoury "do something" when he ordered Bakhoury to shoot Veale. App. at 2104-05.

This supports a reasonable inference that Irizarry had two objectives in ordering Bakhoury to "do something." First, Irizarry sent a clear message to the enterprise's current and future debtors that failure to repay a debt would be hazardous to the debtor's health. Second, Irizarry was teaching Bakhoury, a member of the crew, that he needed to be tough. It must be remembered that Irizarry told Bakhoury after the murder that "[y]ou got to learn to be tough because if Kyle gets over on you, everybody else is going to get over on you." App. at 2106-2107. As the government submits: "Having tough and loyal crew members was clearly in the interests of an enterprise that, *inter alia*, collected debts through violence."

### (ii).  The Ruiz murder.

Jason Maldonado, a friend of Ruiz, testified that shortly before Ruiz' death, Ruiz told him that Irizarry was looking for people to participate in a robbery for the organization. App. at 3429. Ruiz told Maldonado that Irizarry was asking about him and whether Maldonado would be interested in being involved in the robbery. *Id.* Ruiz also approached Michael Monserrate about assisting in the robbery. App. at 3410-11.

On February 22, 1997, Irizarry claimed that his apartment had been burglarized. App. at 3650-51. Irizarry

suspected Ruiz, app. at 3717-19, and told Angel Francolino and Elizabeth Griesi, "I'm going to kill that f'n kid." About one week later, Irizarry killed Ruiz. App. at 3607, 3653, 3735-36.

Irizarry claims the Ruiz murder was not related to the affairs of the enterprise because the evidence only shows that his alleged motive in killing Ruiz was retaliation for burglarizing Irizarry's apartment. Again, we disagree. Even if the Ruiz murder was motivated by Irizarry's belief that Ruiz had burglarized his apartment, the murder still served to send a message to someone who would demonstrate such complete disrespect of Irizarry's stature in the enterprise. That disrespect was a threat to Irizarry's role as the enterprise's enforcer and it therefore threatened to erode his value to the enterprise. In fact, after the murder, Irizarry told Griesi that he had to kill Ruiz "to make an example" out of him "[s]o no one will do that to me." App. at 3736. Therefore, the jury could reasonably conclude that Irizarry murdered Ruiz to show that he was in control and was to be feared. In Irizarry's mind, the message that would quickly spread to past, present and future debtors (as well as others), was that Irizarry was to be feared, and not to be treated disrespectfully. That clearly furthered the affairs of the enterprise, and Irizarry's value to it.

In addition, and even more directly, there was evidence from which the jury could reasonably conclude that Irizarry wanted Ruiz dead because Ruiz was "running his mouth" about the robbery Irizarry was planning on behalf of the enterprise. Soto testified that around the time of Ruiz's murder, Irizarry visited him in prison and told him that "things [ ] in the street . . . [were] hot right now." App. at 1229. Irizarry told Soto that "[h]e was being questioned in connection with something that happened" on the street . . . someone died." *Id.* Soto testified that Irizarry told him that this "someone" "had a big mouth and he was running his mouth." App. at 1230. Irizarry told Soto that he did "what [he] had to do." *Id.* From this testimony, the jury could reasonably infer that Irizarry killed that "someone." Furthermore, in light of the testimony that Ruiz knew about the planned robbery and told Maldonado and Monserrate about it, the jury could infer that Irizarry and Soto were

speaking about Ruiz. Thus, Ruiz's murder was related to the affairs of the enterprise because the enterprise could not have its criminal plan compromised by public discussion.

### (iii).   The Marmora/Pavone murders.

Irizarry also claims that the Marmora/Pavone murders were not related to the affairs of the enterprise because there was no evidence that any "superior" ordered the "hits." We disagree. This argument ignores evidence that, after the murders, Durso suggested to McGuiness that he (Durso) "opened the door" when McGuinness asked him how he felt about the rumors that Irizarry killed his cousin. App. at 3201. Given the evidence that Durso was Irizarry's boss in the enterprise, the jury could reasonably infer that Irizarry had Durso's approval to commit Marmora's murder. In fact, this is the only reasonable inference one can draw from that testimony. Although that testimony goes to Marmora's murder, and not Pavone's, Pavone was an eyewitness to the murder of his roomate, Marmora. The jury could reasonably conclude that Pavone was killed in order to silence him, and this furthered the interests of the enterprise by eliminating proof of Marmora's murder, and insulating Irizarry from it.

### C.   The District Court Did Not Err by Not Instructing the Jury that Motive was a Necessary Element of the Offenses Charged in the Indictment.

The district court gave the following jury instruction on motive:

> Motive and intent should never be confused. Motive is what prompts a person to act or fail to act. Intent refers only to the state of mind with which the act is done or omitted. Proof of motive is not a necessary element of this crimes in this Indictment. Proof of motive does not establish guilt nor does lack of motive establish that the defendant is innocent. If the guilt of the defendant is shown beyond a reasonable doubt, it is immaterial what the motive for the crime may be or whether any motive may be shown.

> The motive of the defendant should not be considered except to the extent that the evidence of someone's motive may aid your determination of his state of mind or intent. . . .

App. at 4667. This instruction was given in the context of instructions on the "definition of knowingly and wilfully." It was given after the court instructed the jury that it had to find "with regard to each Count of the Indictment, that the government has proven that the defendant knowingly and wilfully violated the law." App. at 4665.

The precise nature of Irizarry's challenge to this instruction is elusive, and he raises it for the first time on appeal. Accordingly, it has been waived. However, even if Irizarry had properly preserved this argument, we would be constrained to reject it. To the extent that Irizarry is arguing that the charge was improper because the district court did not instruct the jury that it must find that Irizarry's motive in committing each predicate act was to further the affairs of the enterprise, his argument is without merit.

The district court properly instructed the jury that the government is required to prove "the defendant knowingly and wilfully conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity," as an element of its RICO charge. App. at 4687-88; *see* 18 U.S.C. § 1962(c). The district court also instructed the jury in accordance with our precedent, that the government may establish this element by showing either (1) the defendant "is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise" or (2) "the predicate offenses are related to the activities of that enterprise." App. at 4689-90, *see United States v. Provenzano*, 688 F.2d 194, 200 (3d Cir. 1982) (quoting *United States v. Scotto*, 641 F.2d 47, 54 (2d Cir. 1980)). The government does not have to show that the defendant's motive in committing the predicate act was to further the affairs of the enterprise. In fact, a defendant can commit a predicate act that is detrimental to the enterprise so long as the evidence establishes the requisite nexus between the predicate act and the enterprise. *Provenzano*, at 200

(recognizing that by accepting bribes in exchange for allowing violations of a collective bargaining agreement, the defendant was conducting the RICO enterprise local union through racketeering activity even though the union was harmed by the racketeering activity).

### D.  Evidence of Uncharged Acts.

Irizarry claims that the district court erred by admitting evidence of uncharged acts in violation of Fed.R.Evid. 401 and 403. His entire argument on this point is as follows:

> On June 6, 2001, after the jury had been selected, the Government informed counsel that it intended to introduce into evidence several robberies in 1996 and terroristic threats in early 1994. These separate crimes were not mentioned in the indictment returned in the case *sub judice*. Defendant objected to the introduction of these uncharged crimes under Federal Evidence Rule 401 and 403. The Government claimed that the evidence was admissible to prove the existence of the enterprise.

> Defendant submits the Government simply circumvented the Grand Jury process by introducing this evidence on an erroneous theory that these allegations somehow prove the existence of a RICO enterprise. These uncharged criminal acts did nothing to prove the existence of a RICO enterprise.

Irizarry's Br. at 53.

However, Irizarry does not specifically identify the uncharged acts he is referring to or the context in which the evidence was admitted. It is therefore difficult to determine if the court abused its discretion in admitting the evidence. Fed.R.App.P. 28(a)(9)(A) requires that the argument section of appellant's brief contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the claim does not comply with that rule." An appellant who fails to comply with this requirement fails to preserve the arguments that could otherwise have been raised. *See Lunderstadt v. Colafella*, 885 F.2d 66, 78 (3d Cir. 1989). *See also United States v.*

*Voigt*, 89 F.3d 1050, 1064 n.4 (3d Cir. 1996) ("[B]riefs *must* contain statements of all issues presented for appeal, together with supporting arguments. . . .") (emphasis in original).

### E. Denial of Continuance.

Irizarry claims that the district court abused its discretion when it denied his request for a continuance. He claims that a continuance was necessary to enable him to address the Veale murder. The Veale murder was added as an additional predicate act in the second superseding indictment that was filed April 11, 2001. He also maintains that a continuance was necessary to allow him sufficient opportunity to examine the discovery regarding the Veale and Marmora/Pavone murders that the government provided on May 18, 2001. However, Irizarry requested the continuance on May 29, 2001, approximately two weeks before the scheduled trial date of June 11, 2001.

The trial court's decision to deny a continuance is reviewed for abuse of discretion. *United States v. Kikumura*, 947 F.2d 72,78 (3d Cir. 1991). "[D]enying a request for a continuance constitutes an abuse of discretion only when it is 'so arbitrary as to violate due process.'" *Id.* quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964). Given the sequence of events listed above, Irizarry claims that the district court abused its discretion because "the Government literally had years to prepare . . . for trial. The defense in reality had only two weeks." Irizarry's Reply Br. at 23. In denying Irizarry's request, the district court noted that the amount of additional paper pertaining to the Veale murder was "not big." App. at 348. The Government further explained to the district court that the documents from the Marmora/Pavone murders were not "close to being *Brady* material," but were being provided to defense counsel out of an abundance of caution. App. at 348. We see nothing in the record to contradict these claims, and Irizarry has pointed to nothing that refutes them. The district court denied the request for a continuance because the trial was scheduled to start twelve days from the date the continuance was requested. App. at 349.

We find no abuse of discretion. Irizarry's counsel had notice of all of the government's allegations and predicate acts charged against Irizarry, except for the Veale murder, when the original indictment was filed on May 24, 2000; over one year prior to the start of the trial. The second superseding indictment was filed on April 11, 2001, approximately two months prior to the start of the trial. Although it would have been preferable to afford defense counsel additional time to examine the material relating to the recently filed second superseding indictment, we can not conclude that failure to do so constituted an abuse of discretion. Moreover, given the numerous predicate acts including several murders (many of which are uncontested) that Irizarry knew about more than a year in advance of trial, we fail to see how he was prejudiced by the relatively brief period between the addition of the Veale murder and the trial. *See United States v. Vaughn*, 111 F.3d 610, 613 (8th Cir. 1997) (finding no abuse of discretion in denying continuance where defendant's "trial did not start until . . . thirty-two days after the grand jury returned the latest indictment".).

Irizarry simply asserts that "the interest of justice required more time for counsel to prepare." Irizarry's Br. at 56. However, he makes no effort to demonstrate how the denial of his request for a continuance prejudiced him or impaired his two defense counsels' ability to prepare a defense.[20]

### F.   The Government's Improper Cross-Examination.

Irizarry's last claim is that the "federal prosecutor repeatedly used improper methods to convey highly prejudicial information to the jury" while cross-examining him, and that this denied him a fair trial.

"[T]he scope of cross-examination is left to the sound

---

20. He claims that the documents supplied on the Marmora/Pavone murders were *Brady* material and should have been turned over much earlier, and that prior to May 18, 2001, he had received only a "small fraction of the discovery" he was ultimately given. Irizarry's Reply Br. at 22. However, both claims are simply undeveloped assertions.

discretion of the trial court, and [the court of appeals] will reverse only for an abuse of discretion." *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991). Improper questioning rises to the level of reversible error when the "misconduct . . . is of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (citations and internal quotations omitted). Such prosecutorial misconduct is grounds for reversal "only if it causes substantial prejudice." *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999).

In determining whether a prosecutor's questioning denied the defendant a fair trial, "it is important as an initial matter to place the remark in context" of the entire trial. *Greer*, 483 U.S. at 766 (citation, internal quotations and brackets omitted). *United States v. Retos*, 25 F.3d 1220, 1224 (3d Cir. 1994). Moreover, when a defendant fails to object to the remarks that he/she challenges for the first time on appeal, we review the claim "under the more deferential plain error standard." *United States v. Hinton*, 31 F.3d 817, 824 (9th Cir. 1994). Accordingly, Irizarry must now "demonstrate prosecutorial misconduct [resulted in] an egregious error or a manifest miscarriage of justice." *United States v. Brown*, 254 F.3d 454, 458 (3d Cir. 2001).

Irizarry has specifically identified eight instances of alleged improper cross-examination. Each is considered separately below.

### (i). Cosmo Ocensio.

Irizarry contends that it was improper for the government to ask him on cross-examination whether he knew his former boxing manager, Cosmo Ocensio, was an associate of the Genovese crime family. In his view, such evidence "would not have been admissible if offered since it was irrelevant and highly prejudicial." Irizarry's Reply Br. at 24. We agree that asking Irizarry on cross-examination whether he know that Ocensio was an associate of that crime family was improper. However, defense counsel quite properly objected and the district court instructed the jury to "disregard the question" and "[s]trike it from your mind." App. at 4368. The government then asked Irizarry whether

he knew "*if* Cosmo Ocensio is connected with the Genovese crime family?" App. at 4369. For some reason, defense counsel did not restate his objection, and Irizarry answered, "No." App. at 44369.

Later in the day, the government asked Irizarry: "Isn't it true that you ended up going down to Marion [a section of Jersey City] instead of being a professional boxer or instead of being in the Olympics because the person you [were] working with was in the Genovese crime family?" App. at 4414-15. Again, there was no objection, and Irizarry answered, "No[ ] [t]ruth." App. at 4415.

The first question set forth above assumes a question that was not in evidence; however Irizarry did not answer it, the court sustained a proper objection, and gave an appropriate cautionary instruction. However, the second and third questions were arguably proper because Irizarry had testified on direct examination that he quit boxing because of "bad management." App. at 4183. Consequently, the government inquired into whether the reason Irizarry quit boxing and joined the enterprise was that Ocensio introduced him to criminal figures. *See United States v. Payton*, 159 F.3d 49, 58 (2d Cir. 1998) ("When a defendant offers an innocent explanation [for his criminal conduct] he 'opens the door' to questioning into the truth of his testimony, and the government is entitled to attack his credibility on cross-examination."). Moreover, to the extent that this inquiry crossed the line of propriety, we are convinced that it does not rise to the level of plain error, and we therefore reject the challenge based upon it.

### (ii). Ranieri's 1968 Murder Charge.

Irizarry claims that the government engaged in misconduct by asking him on cross-examination whether he knew that the reason Ranieri left Sicily had "[s]omething [to do] about a murder in 1968." App. at 4490. Defense counsel objected, but Irizarry answered: "I never talked to him." Nevertheless, the court sustained the objection and again instructed the jury to "disregard" the "question about Massimo Ranieri this morning allegedly leaving Sicily for some reason or other." App. at 4523. The district court also

reminded the jury that questions by attorneys are not evidence and "[i]f there are any questions which remain unanswered, they don't constitute evidence in this case." App. at 4522. In addition, any negative inference related to Ranieri's bad act, not Irizarry's. Thus, whatever tar may have flung from that brush landed on Ranieri, not Irizarry. Accordingly, the question does not afford Irizarry ground for relief, particularly given the court's proper cautionary instruction. *See Shannon v. United States*, 512 U.S. 5763, 585 (1994) (it is "the almost invariable assumption of the law that jurors follow their instructions") (citation and internal quotations omitted).

### (iii). The LaScala Tapes.

During the trial, the district court heard oral argument regarding the admissibility of audio tapes containing a conversation with Joseph "Pepe" LaScala in which LaScala discusses Irizarry. This occurred outside the presence of the jury. App. at 3523-24, 3531. The government claimed that Irizarry and Rotolo had discussed beating up Mike Della Rosa, and that Rotolo had, in turn, discussed the situation with LaScala. LaScala was reputed to be the head of a criminal organization, and Rotolo's boss. *Id.* However, LaScala refused to permit Irizarry to touch Della Rosa. The district court denied the request to admit the recorded LaScala conversation. However, Irizarry argues that during his cross-examination, the government asked: "as to the contents of tapes involving Pepe LaScala previously ruled inadmissible by the Court." Irizarry's Br. at 59. He claims that this question was prejudicial because LaScala is a high-ranking member of organized crime.

The precise questioning by the government was:

Q: Did you ask Tony Rotolo to go to Pepe LaScala about this situation?

A: No.

Q: Do you know [who] Pepe LaScala is?

A: No.

App. at 4372. At this point there was no objection to either question. The government then attempted to ask another

question: "Do you know who is?" Irizarry interrupted and said, "I went out to his daughter's girlfriend." App. at 4372. Defense counsel requested a side bar during the course of which the district court told the government not to "ask those questions." App. at 4373. The district court then instructed the jury:

> There were a series of questions in which the name Pepe LaScala was used. All of those questions are irrelevant to this particular case. I would ask you to disregard and strike from your mind all of the questions. Perhaps, there were three or four which used the name Pepe LaScala. Pepe LaScala is not part of this case. He has nothing to do with this case. You are to disregard that conversation.

App. at 4377.

The prosecutor's reference to Pepe LaScala was as impertinent as it was improper and irrelevant. If it served any purpose other than an attempted end run around the court's prior ruling regarding the audio tapes, we can not identify it. Such questioning could well be grounds for a finding of prosecutorial misconduct and also entitle a defendant to relief in an appropriate case. However, viewing this record in its entirety, we conclude that this is not such a case. The court gave a proper cautionary instruction, and the prosecutor's apparent attempt to circumvent the court's earlier ruling ended with the side bar and the court's admonishing of the prosecutor.[21]

---

21. We are indeed troubled that a prosecutor would forget that he/she is an officer of the court and indulge in this type of questioning after a court has made a ruling that would have alerted any experienced trial counsel to the impropriety of pursuing the inquiry. Such tactics do not speak well of attorneys who resort to them, and they also run the very real risk that the fruits of a difficult and costly investigation will be lost all because counsel is unwilling to content himself/herself with a court's rulings or the limitations of propriety and resort instead to innuendo and insinuation rather than evidence to "earn" a conviction.

We of course understand that contested criminal trials are emotional encounters. This is especially true when they involve the kind of allegations contained in this indictment, and a key protagonist is on the witness stand. However, that is no excuse for the kind of borderline

### (iv).  Durso's Implication of Irizarry.

Irizarry claims that the government improperly "brought out that co-defendant Durso had implicated [him] when he pled guilty to Racketeering." Irizarry's Br. at 59. The challenged questioning is as follows:

Q:  When Franco got arrested, he had a gun?

A:  Franco has nothing to do — You keep pointing at me. This got nothing to do with me.

Q:  Just so I understand you. What are you saying about Franco? Frank is a what?

A:  Franco?

Q:  Yes.

A:  Franco is walking out before the next Olympics. This has is [sic] nothing to do with me.

Q:  You do not know when Franco was arrested?

A:  I kind of got the idea you gave him a plea. He pleaded guilty to what you permitted him to do.

Q:  He pleaded guilty to racketeering conspiracy. Racketeering?

A:  For assault. Not me.

Q:  20-year maximum. You know what?

A:  No, I don't.

Q:  You don't know?

A:  I know he got a deal. I know another guy will walk on the streets for crimes he committed. Doesn't implicate me. I didn't kill anybody.

---

ethics that all too often allow an attorney to justify what would easily be recognized as a "cheap shot" by the more objective observer. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) (prosecutorial misconduct can be of sufficient magnitude to deny a defendant a fair trial). However, despite our concern for, and displeasure with, some of the tactics and questions the prosecutor resorted to here, it is clear from our examination of the record, that this is not an appropriate case for relief given the totality of the circumstances.

Q:   Did Franco implicate you?

A:   I'm not talking about Franco. I know he implicated me on arson.

App. at 4390-91. Defense counsel never object to this line of questioning.

We assume that Irizarry is complaining about the government's question "Did Franco implicate you?" However, in his Brief he never explains why that question is improper. Irizarry's Br. at 59. In his Reply Brief, he appears to change his argument by saying that unless a co-defendant testified, the co-defendant's guilty plea is inadmissible at defendant's trial. Reply Br. at 27. However, inasmuch as Irizarry's response arguably opened the door to the government's question regarding Durso's guilty plea, this is not plain error.

### (v).   Elizabeth Griesi.

Irizarry argues that Elizabeth Griesi "was a crucial witness for the Government in the murder of Jose Ruiz." Reply Br. at 28. He alleges that the government improperly "stated that [he] abused Griesi during their relationship." Irizarry's Br. at 59. The challenged questioning is as follows:

Q:   You weren't asked this question, either, but you volunteered [on direct examination] that you never laid a hand on her?

A:   I didn't.

Q:   Were you concerned that the jury might be concerned about you hitting her?

A:   The ex-boyfriend beat her.

Q:   I'm talking about you.

A:   Her ex-boyfriend.

Q:   By the ex-boyfriend.

A:   Yes.

Q:   Not by you?

A:  No.

Q:  Not by you. You weren't asked any questions about hitting her. You decided to say "I never beater [sic] her; the ex-boyfriend did" without question?

********

Q:  You threatened her?

A:  Absolutely not.

Q:  You threatened her after you killed Jose Ruiz. You threatened her.

A:  I did not kill Jose Ruiz.

Q:  You told her "If you tell anybody, I will cut you up and put you in the ocean." That's what you said to her?

A:  I didn't threaten her. She went to Cancun with me.

App. at 4410-12. Defense counsel made no objections to this questioning.

On appeal, Irizarry argues that this line of questioning was improper because he was not charged with making a terroristic threat against Griesi. He also argues that it was improper because he attempted to attack her credibility on the ground that she delayed for several years reporting that he told her he murdered Ruiz. As Irizarry notes, she came forward with that information only after the government threatened her with criminal charges. According to Irizarry, this improper questioning "permitted the jury to consider without foundation that she failed to report this alleged admission because defendant had threatened her."

The government claims that the questioning was proper because it was prompted by Irizarry's voluntary statement that he "never put [his] hand on her" when defense counsel asked him on direct why they broke up. App. at 4252. The government claims that it could then cross-examine Irizarry about the truthfulness of his direct testimony, i.e., that he never assaulted Griesi. *See* Fed.R.Evid. 611(b).[22]

---

22. Which provides, in relevant part: "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness."

Irizarry's attempt to rest relief upon this questioning is fatally undermined by our plain error review and the cautionary instruction the district court gave. The day following the questioning, the district court reminded the jury that "[i]f there are many questions which remain unanswered, they don't constitute evidence in this case." App. at 4522. With specific reference to the Griesi questioning, the district court further stated:

> There has been some question about a statement may have been made and a question on Tuesday. Something about beating and threatening to kill Elizabeth Griesi. There is no testimony to support that. That may have been asked in the question. If it was asked in the question, it was denied, in any event. You are to disregard the question and anything concerning that.

App. at 4522-23. Accordingly, even if we were to reject the government's proffered defense of this inquiry, we would still be constrained to conclude that it does not amount to plain error, and we therefore reject Irizarry's claim for relief based upon it.

### (vi).  Michelle Perez.

Irizarry claims that the government "improperly implied that [he] incriminated himself to Ms. Perez." Irizarry's Br. at 60. Irizarry dated Perez prior to the Marmora/Pavone murders in December 1993. Apparently, local law enforcement wanted to question him about those murders after Perez told a homicide detective that Irizarry had told her that he was supposed to see Marmora the day he was killed. Perez was not called as a witness.

The government asked Irizarry: "You wouldn't have any reason to discuss with her [Perez] anything about Joseph Marmora or anything that might have happened at 608 Tonnelle Avenue [the scene of the Marmora murder], correct?" App. at 4522. Before there was any response, defense counsel objected. However, the government then said that it would move on to another area of questioning and the district court instructed the jury to "[d]isregard the question." App. at 4522. The district court then once again

cautioned that questions are not evidence. Because the question was not answered and the jury was told to disregard it, we can not conclude that Irizarry suffered substantial prejudice. However, we must again note that there was no need for the prosecutor to venture down this road and doing so could have risked the very conviction he was trying so zealously to secure.

### (vii).   Nancy Padilla.

Irizarry criticizes the government's questioning whether Nancy Padilla, a former girlfriend, was kicked out of her apartment because Irizarry was selling drugs. Irizarry's response was "That's not true." The government argues that it was permitted to ask the question to challenge Irizarry's claim that he and Padilla were evicted from the apartment. It also argues that the subject-matter was so peripheral to the issues that it could not possibly have prejudiced Irizarry. Significantly, Irizarry agrees that the subject matter of the question was so peripheral to the issues that it could not have prejudiced him and would not be grounds for reversal. Nonetheless, he argues that we consider this question in context with the cumulative effect of all the government's misconduct rather than view it as an isolated attempt to explore the irrelevant. We agree that the question about Padilla is peripheral. In fact, given the government's concession that the question was peripheral, we can not help but wonder why the prosecutor was so intent on dredging it up and allowing the jury to peek at it. However, inasmuch as Irizarry has not demonstrated the necessary prejudice from the cumulative impact of the prosecutor's transgressions and zeal, no relief is warranted.

### (viii).   Cross-examination on Uncharged Crimes.

Irizarry claims that the government improperly cross-examined him on uncharged criminal activity. This argument arises from the fact that the prosecutor asked Irizarry why he had a driver's license and social security card for James Bryan Ballentine in his wallet at the time of his arrest. App. at 4400-02. Irizarry answered that he did not know. *Id.* The government also asked him about

numerous blank social security cards recovered from his apartment. App. at 402-03. At first, Irizarry stated that he found the blank cards. Later he changed his story and explained that he obtained them from an individual named "Nicky Ladagna" and that he intended to sell them. App. at 4402-03. The district court twice instructed the jury that this "was not a charge in the Indictment." App. at 4404-05. The government then asked Irizarry whether this was the first time he sold blank social security cards and Irizarry responded that he had also sold birth certificates. App. at 4405.

Irizarry argues that "the clear purpose of the questioning was to convey the message to the jury that because he committed these uncharged acts of misconduct, he was a 'bad person' who must be punished." Reply Br. at 31. However, inasmuch as Irizarry was a witness, his character for truthfulness was an issue for the jury's consideration. Moreover, since the government never attempted to introduce extrinsic evidence under Fed.R.Evid. 404(b), the testimony is controlled by Fed.R.Evid. 608(b) which states:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than the conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may . . . in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Fed.R.Evid. 608(b). We agree that the challenged evidence tended to tended to show deceit, and it was therefore admissible to establish Irizarry's lack of truthfulness, not his character. *Cf. United States v. Williams*, 986 F.2d 86, 89 (4th Cir. 1993) ("[Defendant's] possession and use of false identification to cash stolen checks certainly are probative of his truthfulness and credibility as a witness. . . .").

## IV.  CONCLUSION

For all of the above reasons, we will affirm the district court.[23]

A True Copy:
     Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*

---

23. In addition to the eight instances discussed, Irizarry makes a broad complaint that "there were numerous occasions where the prosecutor badgered the defendant; improperly made declaratory statements of defendant's guilt; made conclusiary (sic) statements; and asked improper hypothetical questions." Irizarry's Br. at 61. However, he merely cites to page numbers in the appendices where he claims this alleged misconduct occurred. He has not developed any argument as to why the cited instances would constitute prosecutorial misconduct. Therefore, he has not preserved any claim on appeal as to those cited instances. *See* Part III.B., *supra.*