NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 19-3833

———————

UNITED STATES OF AMERICA

v.

KHALIL STAFFORD, aka Stod,
aka Homicide,

Appellant

———————

Appeal from the United States District Court
for the District of New Jersey
(District Court No. 2-14-cr-00220-011)
District Judge: Honorable Madeline C. Arleo

———————

Argued on April 21, 2021

Before: AMBRO, RESTREPO, <u>Circuit Judges</u>, and NOREIKA,[*] <u>District Judge</u>

(Opinion Filed: December 20, 2021)

John J. McMahon (Argued)
80 Main Street
Suite 580
West Orange, NJ 07052

    Counsel for Appellant

Mark E. Coyne
Rachael A. Honig

———————

[*] The Honorable Maryellen Noreika, United States District Judge for the District of Delaware, sitting by designation.

Richard J. Ramsay (Argued)
970 Broad Street
Newark, NJ 07102

       Counsel for Appellee

---

OPINION[**]

---

AMBRO, Circuit Judge

Following an acquittal in New Jersey state court and a hung jury in an earlier federal trial, Khalil Stafford was convicted in the District of New Jersey of various drug and racketeering charges stemming from his activities in the Grape Street Crips. Stafford appeals to us, raising eight issues with his prosecution and conviction. We agreed to hear argument on two: (1) whether the District Court abused its discretion by excusing three jurors on the eve of deliberations, and (2) whether it erred in the instructions it gave for murder, a part of Stafford's racketeering convictions. We conclude that neither of these issues, nor any of the other six, justify disturbing his conviction. Thus we affirm.

## I. Background

Khalil Stafford is a longtime member of the Newark, New Jersey chapter of the Grape Street Crips. In June 2010, he was attending a cookout when a shootout among members of the Crips erupted. When one of the gang members ran into a neighboring

---

[**] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

home, innocent women and children sitting on the front porch were caught in the crossfire. One of the women, Hope Williams, was shot and killed.

The facts of the shootout are highly disputed. On Stafford's telling, he caught wind of a conflict between Tawan Williams' brother, Iyan Williams, and Aaron Terrell.[1] Iyan allegedly blamed Terrell for his brother's death, in whose memory the cookout was being held. When Terrell arrived at the cookout, Iyan, who appeared agitated and under the influence of drugs, became increasingly upset, and his mother encouraged him to avenge his brother. Stafford attempted to act as a peacemaker, but to no avail. Iyan opened fire at Terrell, which instigated the shootout. Stafford denies ever holding or shooting a gun.

In contrast, the Government claims that Stafford and Iyan were disputing an unpaid drug debt. When Stafford requested payment, Iyan refused and brandished his gun. Stafford interpreted this rebuff from a more junior Crips member as a sign of disrespect. He left the cookout and met up with Terrell and other Crips. The group obtained three guns and returned to confront Iyan. When they arrived back at the cookout, they opened fire on Iyan and his ally, Mustafa Stribling, triggering the shootout.

Stafford, Terrell, and others were prosecuted for the murder of Hope in New Jersey state court but were acquitted in April 2013. Over two years later, Stafford and several co-defendants were indicted on various drug-related and Racketeer Influenced and Corrupt Organizations (RICO) charges. They did not initially relate to Hope's murder; rather,

---

[1] Iyan Williams and Tawan Williams are not related to Hope Williams. We refer to these persons by their first names for clarity.

3

Stafford was implicated in a broader investigation into the Grape Street Crips and its associates for drug trafficking and violence. In particular, the Government pointed to evidence that Stafford sold heroin to a confidential informant with labels that matched the heroin sold by Hanee Cureton, the operator of a large drug mill in Newark, New Jersey. Stafford maintains that his trafficking in drugs was an exclusively private endeavor in support of his own drug habit rather than a gang-run operation and claims that the packages he sold to the informant contained party tickets, not heroin.

The first federal trial ended in a mistrial after a hung jury. The Government then sought to sever the defendants into two groups: Corey Hamlet, Tony Phillips, and Ahmad Manley were classified as "violent" drug offenders who were tried first and found guilty in July 2018. Stafford and Cureton, the ostensibly "non-violent" drug-offenders, were retried, now on the seventh superseding indictment. For the first time, the Government added Hope's murder as a predicate RICO offense, as well as a separate Violent Crimes in Aid of Racketeering Act ("VICAR") count, against Stafford. The Government claims it added these counts after Terrell became a cooperating witness and provided critical evidence, later testifying that Stafford started shooting first after they saw Stribling reaching for his gun. Stafford moved to dismiss the new indictment on various grounds that included vindictive prosecution, but his motion was denied except with respect to one firearms charge that the Government conceded was beyond the statute of limitations. Cureton pled guilty and Stafford proceeded to trial, where he testified in his defense.

4

Prior to the prosecution's rebuttal summation, a deputy marshal reported a conversation he overheard while driving a van containing some of the jurors. The Judge promptly questioned the marshal and jurors. The marshal stated he heard a woman discuss her sister's experience as a juror on a trial in which the jury wrongly found the individual guilty. Another juror purportedly responded with an affirmation. When questioned, however, the jurors primarily recalled a conversation about how the justice system in the United States differs from the justice system in Spain. The Government moved to exclude jurors 3, 5, and 10 on the grounds that they were discussing the consequences of wrongly finding a defendant guilty and because they were being evasive with the Judge during questioning. Stafford countered that the Government was attempting to strike an African-American woman who seemed sympathetic to Stafford's theory of the case. The Judge dismissed jurors 3, 5, and 10 and replaced them with alternates.

Stafford moved for a mistrial based on the allegedly improper replacement of the three jurors, as well as that Terrell referred to Stafford as his alias—"Homicide"—on the stand; both motions were denied. The jury ultimately found Stafford guilty of RICO (count 1), specifying two predicate acts: the murder of Hope and conspiracy to distribute and to possess with the intent to distribute heroin in quantities larger than one kilogram. They also found him guilty of VICAR based on the murder (count 2), conspiracy to distribute and possess with intent to distribute more than one kilogram of heroin (count 3), and distribution and possession with intent to distribute heroin (count 4). Stafford then unsuccessfully moved for judgments of acquittal for insufficiency of evidence. At the same

time, the District Court also rejected Stafford's argument that his prosecution put him in double jeopardy. He appeals to us.

## II. Discussion[2]

We address each of Stafford's eight issues in turn.

### A. The District Court Did Not Abuse Its Discretion by Replacing Three Jurors on the Eve of Deliberations.

Stafford fi rst takes issue with the District Court's decision to replace jurors 3, 5, and 10 with alternate jurors on the eve of deliberations. We review the removal of jurors for abuse of discretion. *United States v. Penn*, 870 F.3d 164, 169 (3d Cir. 2017).

A trial court may use alternate jurors to "replace any jurors who are unable to perform or who are disqualified from performing their duties." Fed. R. Crim. P. 24(c). We give great deference to those decisions. The rule does not impose any particular procedures on the court. *See Penn*, 870 F.3d at 169. Instead, we have upheld its decision to replace jurors where it had "clearly articulated its reasoning on the record." *Id.* at 170. And further, we have cited to the Seventh Circuit for the proposition that we "will not overturn the trial court's decision to dismiss a juror pursuant to Rule 24(c) unless *no legitimate basis* for the court's decision can be found in the record." *Id.* at 169 (quoting *United States v. Pineda*, 743 F.3d 213, 217 (7th Cir. 2014) (emphasis in original)).

Here, the District Court engaged in detailed, on-the-record questioning of jurors about the conversation the marshal overheard in the van. Stafford contends that this

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

6

questioning casts doubt on the marshal's account of the conversation and shows that the actual conversation was permissible. This misses the point. Even if the conversation in the van were completely benign, the District Court had the discretion to remove jurors that it found were evasive during questioning, and that reasoning alone, if supported by the record, is enough for us to affirm its decision on appellate review. The Supreme Court, dealing with a case of contempt against a juror for making false statements in *voir dire*, has described a juror whose "answers to [the court's] questions are willfully evasive or knowingly untrue . . . [as] a juror in name only. His relation to the court and to the parties is tainted in its origin; it is a mere pretense and sham." *Clark v. United States*, 289 U.S. 1, 11 (1933); *see also United States v. Thornton*, 1 F.3d 149, 154 (3d Cir. 1993) (reinforcing "the district court's wide latitude in making the kind of credibility determinations underlying the removal of a juror" in the context of the court observing that a juror "protested too much and I just don't believe her"); *cf. United States v. Augustin*, 661 F.3d 1105, 1134 (11th Cir. 2011).

Because the District Court supported its reasoning with specific and plausible evidence in the record, we cannot conclude that it abused its discretion in finding these jurors were evasive. After questioning them, the Court took a moment to "go through the evasiveness on the record[,] . . . begin[ning] with [juror] number three." App. at 3166. It noted that after it asked whether "someone relate[d] the story of an experience of another family or friend about their service in a criminal case," Juror 3 responded simply by asking "Someone?" *Id.* When asked whether she was a participant in the conversation, Juror 3

7

responded "No," but then said she was "trying to remember," followed by she was "in the middle." *Id.* at 3166–67. The Court then contrasted Juror 3's answers to the questions with those of Juror 10, who relayed that Juror 3 actually did participate in this conversation by stating "wow" in response to a story about someone being incorrectly found guilty. *Id.* at 3168. This discrepancy was particularly notable, as Juror 10 "later admitted" that she was the one who "began the conversation." *Id.* at 3170.

This concession by Juror 10, however, was also far from forthcoming. The District Court noted that she replied "I'm trying to think" several times in response to simple and direct questions about the conversation in the van. *Id.* at 3170–71. It was not until she was called back that she finally admitted she brought up the topic. *Id.* at 3172.

Stafford places special emphasis on the exclusion of Juror 5, who he claims appeared to be receptive to his case. But the District Court had a plausible and neutral reason to exclude Juror 5. It concluded that she was "not fully candid" in her responses, noting that she hedged her answers several times with language like "I can't say with certainty." *Id.* at 3168. And the Court noted that it "asked four times about a criminal trial, a result, and there was really no answer. It was never a denial; it was, I'm not sure, I don't remember the details." *Id.* at 3169. Only after substantially more questioning did Juror 5 finally concede that there was a conversation about a case in Spain. *Id.* at 3170. Moreover, Stafford has not shown he has a right to retain Juror 5 in particular, especially given he does not contend that the jury he ultimately received was partial or improperly excluded

8

some class of jurors.[3] *See Penn*, 870 F.3d at 168 (citing *United States v. Mendoza*, 510 F.3d 749, 754 (7th Cir. 2007), for the proposition that "Mendoza is not entitled to any Hispanics on the jury, nor by implication is he entitled to any one individual juror"); *United States v. Shiomos*, 864 F.2d 16, 18–19 (3d Cir. 1988) (declining to find reversible error in a jury sequestration order that affected the composition of the jury where the defendant "has not shown that some class of jurors was improperly excluded . . . or that the panel ultimately chosen was in any way not impartial"); *Thornton*, 1 F.3d at 154 (affirming the District Court's decision to replace a juror who was observed by a marshal to be exchanging "smiles, nods of assent, and other non-verbal interaction" with the defendant).

To be clear, we do not today conclude that Jurors 3, 5, and 10 were actually evasive, nor do we imply that replacing these jurors was necessary or even the best decision. But, as an appellate court, we are in a poor position to make that determination compared to district court judges, who can carefully observe the responses of the jurors to questioning, including their tone and body language. *See Penn*, 870 F.3d at 171 (citing *United States v. De Oleo*, 697 F.3d 338, 342 (6th Cir. 2012), for the proposition that "district judges are in the best position to view a juror's demeanor and determine whether she is able to shoulder

---

[3] To the extent that Stafford also hints at a possible constitutional argument related to this juror because after her replacement, there "were only one or at most two African-Americans left on the jury," Stafford's Br. at 26, we agree with the Government that this argument is so cursory as to be forfeited. In any case, we have held that "there is no . . . right" for a defendant to "maintain the racial composition of the jury as it was selected." *Penn*, 870 F.3d at 168–69.

9

the obligations of jury service"). Here, the District Court's exercise of its discretion is reasonable and permissible considering the record, and so we will not disturb its decision.

**B. The District Court Did Not Plainly Err in Failing to Provide Additional Instructions on the New Jersey Murder Predicate.**

Stafford next objects that the jury was not instructed that, under New Jersey law, murder is mitigated to manslaughter when it is "committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11–4(b)(2). His theory is that even if he shot and killed Hope in the middle of a firefight, it was in the heat of passion and provoked by others shooting at him.

The Government argues that Stafford's objections to the jury instructions are waived under the invited error doctrine because the instructions were jointly proposed. *See United States v. Ozcelik*, 527 F.3d 88, 97 n.6 (3d Cir. 2008). We do not agree. The instructions do not appear actually to have been proposed jointly. Rather, the Government submitted the instructions to the Court (after providing a copy and having a "consultation with defense counsel"), and the defense made some objections while failing to raise the specific objection now before us. App. at 2212, 2780–2807. Under these circumstances, we will not hold that Stafford invited the error he now asserts. Still, because he did not object to the jury instructions on this ground before the District Court, we review only for plain error. *United States v. Carter*, 401 F.2d 748, 750 (3d Cir. 1968). This means that if Stafford proves the existence of an (1) error that was (2) plain or clear under current law and (3) that prejudiced him (meaning it "affected the outcome of the district court proceedings"), we may exercise our discretion to correct the error if it (4) "seriously

10

affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 732–36 (1993) (internal citation and quotation marks omitted); *see also United States v. Nasir*, 17 F.4th 459, 465 (3d Cir. 2021) (en banc).

We need not conclusively determine whether Stafford would be entitled to this jury instruction because he did not request it, and we conclude the District Court did not plainly err in failing to include the heat-of-passion instruction *sua sponte*. There is neither an on-point case in our Circuit nor a strong consensus in the other Courts of Appeals that would make plain that this instruction would be required. *See, e.g.*, *United States v. Forsyth*, 594 F.2d 947, 952 (3d Cir. 1979) (concluding that it was not necessary to provide instructions on lesser bribery charges in connection with a RICO predicate act); *United States v. Fowler*, 535 F.3d 408, 421 (6th Cir. 2008) (holding that a defendant facing a murder RICO predicate was not entitled to a particular lesser included offense state law instruction); *see generally United States v. Cole*, 567 F.3d 110, 117 (3d Cir. 2009) (setting out situations in which we have found plain error). While we leave open the possibility that the specific New Jersey heat-of-passion instruction relevant here may be distinguished from these cases, the answer is certainly not plain or clear under existing law. And here, even if heat-of-passion manslaughter is a plausible theory, it goes squarely against the primary theory advocated by Stafford—that he was a non-violent peacekeeper, not a justifiably provoked shooter. While defendants are generally free to argue inconsistent theories, it would not be obvious to the District Court that a defendant arguing he did not hold a gun during the shootout would also require a heat-of-passion instruction.

Indeed, even a New Jersey trial court, familiar with the intricacies of its murder statute, would not be expected to issue *sua sponte* a heat-of-passion instruction in this context. *See State v. Robinson*, 643 A.2d 591, 489–92 (N.J. 1994) (holding that the trial court "does not . . . have the obligation on its own meticulously to sift through the entire record in every murder trial to see if some combination of facts and inferences might rationally sustain a manslaughter charge," but instead need only include an instruction "when the facts 'clearly indicate' the appropriateness of that charge" (internal citations and quotation marks omitted)). This reinforces our conclusion that the District Court's failure to do so was not plain error.

### C. Charging Stafford with RICO Murder Does Not Violate Double Jeopardy.

The Double Jeopardy Clause of the Fifth Amendment provides that no person may be "twice put in jeopardy" "for the same offence." U.S. Const. amend. V. Stafford asserts he was tried twice for the same offense because RICO incorporates New Jersey's statutory definition of murder, and a state court jury already acquitted him of murder under New Jersey law. Stafford's Br. at 28–39. We exercise plenary review over the preserved double jeopardy argument. *United States v. Hodge*, 870 F.3d 184, 194 (3d Cir. 2017).

While Stafford's argument is colorable, it is stymied by our precedent. In *United States v. Pungitore*, 910 F.2d 1084, 1107 (3d Cir. 1990), we held that "appellants' previous acquittals for . . . murders do not provide us with reason to disturb their RICO convictions on double jeopardy grounds." This is because the federal interest in prosecuting a RICO offense differs from a state's interest in prosecuting the predicate offenses. *Id.* at 1106 (citing *United States v. Frumento*, 563 F.2d 1083, 1088 (3d Cir. 1977)). By prosecuting a

12

RICO offense, the federal government, unlike a state, seeks to vindicate the effect of the predicate offenses "on interstate or foreign commerce through a pattern of racketeering activity." *Frumento*, 563 F.2d at 1088. *But see id.* at 1099 (Aldisert, J., dissenting) (arguing that double jeopardy should apply when "defendants have previously been indicted, tried, and acquitted of the precise state crime assimilated into the federal crime by definition").

Contrary to the assertion by Stafford, the Supreme Court's recent decision in *Gamble v. United States*, 139 S. Ct. 1960 (2019), does not alter our analysis. Stafford's Br. at 30–37. He contends that, under *Gamble*, his RICO and VICAR charges are impermissible "carve out[s]" and "exceptions" to the double jeopardy rule. *Id.* at 36. On the contrary, *Gamble* merely reaffirmed the dual sovereignty doctrine that motivated our decisions in *Pungitore* and *Frumento*. *See Gamble*, 139 S. Ct. at 1966, 1980; *see also United States v. Lanza*, 260 U.S. 377, 382 (1922) ("[A]n act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each."); *Abbate v. United States*, 359 U.S. 187, 195 (1959) (declining to overrule *Lanza* because "[n]o consideration or persuasive reason . . . is advanced why we should depart from [*Lanza*'s] firmly established principle"). Since *Gamble*, two other circuit courts have rejected double jeopardy challenges to RICO convictions that involve earlier state prosecutions. *See United States v. Brown*, 973 F.3d 667, 702 (7th Cir. 2020); *United States v. Leoner-Aguirre*, 939 F.3d 310, 321 (1st Cir. 2019). Thus *Gamble* does not

13

disturb our precedents in *Pungitore* and *Frumento* that preclude Stafford's double jeopardy argument.

### D. Stafford Has Not Shown that the Government's Addition of the Murder Predicate on Retrial Amounts to Vindictive Prosecution.

Stafford claims that the Government acted vindictively when it added RICO and VICAR charges associated with Hope's murder for his second trial after he went to trial the first time, testified in his own defense, and successfully sought a retrial. **Stafford's Br. at 48.** The District Court denied his motion to dismiss the indictment on this ground, which we review for clear error to the extent it relied on factual determinations and without deference to the extent it applied the law. *United States v. Esposito*, 968 F.2d 300, 303 (3d Cir. 1992).

Stafford's claim of vindictive prosecution is not frivolous. The Government, despite knowing Stafford was previously charged with Hope's murder in state court years earlier, did not charge him in connection with that murder in his first trial. Instead, it added those charges late in the process, after his first trial had resulted in a mistrial, and after it had already classified Stafford as a "non-violent" offender for retrial.

In general, "there are two ways in which a defendant can prove a claim of vindictiveness." *United States v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993). First, he may "use evidence of a prosecutor's retaliatory motive to prove actual vindictiveness." *Id.* Second, "in certain circumstances, a defendant may show facts sufficient [for] a presumption of vindictiveness." *Id.* Here, the District Court found that there was "no

14

evidence of any vindictiveness," and it had "no reason to infer in any way, shape, or form that [adding a charge] was done to be vindictive." App. at 172.

On the record before us, we cannot conclude that this finding was clearly erroneous or that the Court misapplied the law. *See generally United States v. Goodwin*, 457 U.S. 368, 380 n.12 (1982) (noting that the Court's earlier decision had left open "the possibility that a defendant might prove through objective evidence an improper prosecutorial motive," but it had declined to find sufficient proof even when "the prosecutor had stated explicitly that additional charges were brought to persuade the defendant to plead guilty"); *id.* at 380–81 ("[T]here is no evidence in this case that could give rise to a claim of *actual* vindictiveness; the prosecutor never suggested that the charge was brought to influence the respondent's conduct." (emphasis in original)); *Paramo*, 998 F.2d at 1221 (noting that proof of actual vindictiveness is "exceedingly difficult to make," as the Supreme Court has "adopted . . . a strict standard of proof" (internal quotation marks and citation omitted)).

We thus ask whether we have a circumstance pointing to the presumption of vindictiveness. We apply this presumption "only where there exists a realistic likelihood of vindictiveness." *Paramo*, 998 F.2d at 1220 (internal quotation marks and citation omitted). And Stafford's circumstances appear a poor fit for the presumption. *See, e.g.*, *Esposito*, 968 F.2d at 302 n.1 (observing that "the presumption of vindictiveness does not apply" where "the circumstances have changed"); *United States v. Marrapese*, 826 F.2d 145, 149 (1st Cir. 1987) (concluding that "it is unlikely any retaliatory animus flowed from the first trial's ending in a mistrial; after all, the mistrial was due to a hung jury, not to any

15

legal challenge by [the defendant]"); Gov't Br. at 31 (noting that Stafford faced mandatory life in prison regardless whether they had added Hope's murder). But even assuming in Stafford's favor, without deciding, that he could prove a realistic likelihood of vindictiveness that would ordinarily be sufficient to raise the presumption, it "still would not apply" if "the government has proffered legitimate reasons, based on objective record evidence," for its conduct. *Paramo*, 998 F.2d at 1220; *see also Esposito*, 968 F.2d at 305 ("And even if a presumption applies, the government may rebut it by proffering legitimate, objective reasons for its conduct.").

The Government explains that it did not get Terrell (their star witness on the murder) to cooperate and provide inculpatory testimony against Stafford until just before the first trial, too late to add the charge during the first prosecution. This explanation is reasonable and supported by the District Court's recitation of the facts.[4] *See, e.g.*, App. at 169 (noting that the first trial date was "a firm trial date" and that the Court had "vividly advis[ed] that this was to be the last indictment"); *id.* at 170 (finding that "on September 28th[] Mr. Terrell pled guilty and was free to serve as a cooperating witness in this case, and at that point . . . we were literally two weeks away from trial"). Stafford's claim of prosecutorial vindictiveness thus comes up short.

---

[4] Stafford notes that the Government first severed him from some of his co-defendants on the ground that he was a non-violent drug offender, and only later reversed course and sought an indictment related to Hope's murder. This alone does not change our conclusion. *See Goodwin*, 457 U.S. at 382 ("A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct.").

## E. The District Court Did Not Abuse Its Discretion in Failing to Grant a Mistrial Because of One Reference to Stafford by the Alias "Homicide."

The District Court instructed the parties to avoid using Stafford's nickname "Homicide" throughout the trial for obvious reasons.[5] App. at 224–26. Nonetheless, one witness slipped up and called Stafford "Homicide" on one occasion, which was also preceded by the abbreviated form "Homo." App. at 819. The District Court denied Stafford's subsequent motion for a mistrial, a decision that we review for abuse of discretion. App. at 851; *United States v. Lore*, 430 F.3d 190, 207 (3d Cir. 2005).

It is hard to imagine a nickname more prejudicial than "Homicide" in a murder trial. But use of a prejudicial nickname does not always require a mistrial. *Cf. United States v. Williams*, 974 F.3d 320, 361 (3d Cir. 2020) (permitting use of a defendant's nickname "Killer" because it had some probative use). "In reviewing the denial of [a] motion on that standard, three factors guide our analysis: (1) whether [the witness's] remarks were pronounced and persistent, creating a likelihood they would mislead and prejudice the jury; (2) the strength of the other evidence; and (3) curative action taken by the district court." *Lore*, 430 F.3d at 207. Here, as in *Lore*, the "single statement by a witness . . . can hardly be deemed 'pronounced and persistent'" in the context of the three-week trial and the two-day testimony by this witness. *Id.* The record evidence in this case is quite strong, including damning eyewitness testimony by Terrell that tied Stafford to both drug activity and the shooting that led to Hope's murder. *See, e.g.,* App. at 872, 932. And while the

---

[5] However, the Court did allow the abbreviated form "Cide," on the ground that it could be short for words other than homicide and there was probative value because that name matched some documentary evidence in the form of a photo notation. App. at 225, 853.

Court did not issue a curative instruction to the jury regarding this remark, that decision rested with Stafford's counsel, who reasonably declined the Court's offer of an instruction on the belief that it was better to just let it go rather than drawing the jury's attention to it. App. at 852–53 (The Court: "And if you want me to give the instruction, I will, but I thought it was better to let it go . . . ." Defense Counsel: "So thank you for that. Your inclination was the correct one, and I appreciate your handling it exactly as you did . . . . [W]e want you to give the instruction to [the witness,] . . . [a]nd we do not want anything addressed to the jury in any way."). In that context, we are confident the District Court did not abuse its discretion by denying a mistrial based on this isolated use of a prejudicial nickname.

### F. The District Court's Evidentiary Limitations on Stafford's Testimony at Trial Were Permissible.

Stafford takes issue with the District Court's rulings that excluded his own testimony that Iyan was using PCP (a hallucinogenic drug), that Stafford had chastised him about this drug use, and that Iyan and his family blamed Terrell for the murder of Iyan's brother. We generally review evidentiary rulings for abuse of discretion, although we do not apply the deferential standard when (1) a district court does not make a record of the balancing required under Federal Rule of Evidence 403 or (2) when we are interpreting the rules themselves. *United States v. Bailey*, 840 F.3d 99, 117 (3d Cir. 2016); *United States v. Pelullo*, 964 F.2d 193, 199 (3d Cir. 1992). And, to the extent Stafford argues that these evidentiary limitations impermissibly restricted his right to testify in his own defense, we

18

exercise plenary review over this purported constitutional violation. *United States v. Leggett*, 162 F.3d 237, 245 (3d Cir. 1998).

The right to testify in one's own defense "has sources in several provisions of the Constitution," as it is "essential to due process of law," a "necessary corollary to the Fifth Amendment's guarantee against compelled testimony," and separately guaranteed by a defendant's Sixth Amendment right to "call witnesses in his favor." *Rock v. Arkansas*, 483 U.S. 44, 51–52 (1987) (internal quotation marks omitted). But while he has a "right to present his own version of events in his own words," "the right to present relevant testimony is not without limitation." *Id.* at 52, 55. It "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Id.* at 55 (internal quotation marks omitted). Evidentiary rules still apply, so courts must "evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify," and in particular whether the restrictions are "arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 56.

While we do not imply the existence of a *per se* rule, we note that neutrally applied, well justified, and long-established principles of evidence generally do not violate a defendant's right to testify in his own defense. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence."); *United States v. Bifield*, 702 F.2d 342, 350 (2d Cir. 1983) (holding that a defendant's right to testify on his own behalf

19

"does not entitle him to place before the jury evidence normally inadmissible"). *But see United States v. Pohlot*, 827 F.2d 889, 901 (3d Cir. 1987) (concluding that "[e]videntiary rules that would bar the testimony of the defendant himself . . . need particular justification").

Here, the District Court engaged in on-the-record balancing with respect to Stafford's proposed testimony that Iyan appeared to be high on PCP or that they had an argument over Iyan's purported PCP use. The Court concluded it was only "marginally probative" to the question of Hope's murder, specifically to Stafford's story that the shootout was provoked by a fight between Terrell and Iyan. App. at 2422. And, on the other end of the scale, an accusation that Iyan was "smoking marijuana laced with PCP" was "highly prejudicial and confusing to the jury." *Id.* at 2423.

Next, the Court concluded that Stafford's "testimony about . . . Iyan Williams's motive for shooting Terrell because of the death of his brother is not permitted under 403." App. at 2424. It again engaged in sustained consideration and on-the-record balancing, and even heard from Stafford himself in addition to counsel. For example, the Court barred Stafford from testifying to an altercation he witnessed over a year before Hope's murder between Iyan's brother and Terrell. Considering "how remote it is to the actual motive," requiring "so many inferential leaps," and "how far away it is temporally from the shooting

at issue," the Court ruled that the "probative value is substantially outweighed by unfair prejudice, confusion of the issues, [and] misleading the jury." App. at 2415.[6]

While these ruling are debatable, we do not conclude that they were an abuse of discretion. They were therefore permissible applications of Federal Rule of Evidence 403, which has the important purpose of excluding evidence that might unduly prejudice or confuse the jury. *See generally Holmes v. South Carolina*, 547 U.S. 319, 326 (2006) ("While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. *See, e.g.*, Fed. Rule Evid. 403.").

We are further reassured that the application of these rules did not prevent Stafford from conveying to the jury the substance of his side of the story. *See generally Gov't of Virgin Island v. Mills*, 956 F.2d 443, 446 (3d Cir. 1992) (holding that exclusion of relevant evidence is not a Sixth Amendment violation unless the defendant can show: "First, that he was deprived of the opportunity to present evidence in his favor; second, that the excluded testimony would have been material and favorable to his defense; and third, that

---

[6] The Court also expressed concerns that some of this evidence was inadmissible as hearsay (to the extent Stafford intended to recount statements made by Iyan's family) and on the ground that it would impermissibly introduce evidence of other uncharged bad acts by Terrell (the murder of Iyan's brother), one of the Government's witnesses. *See, e.g.*, App. at 2413, 2415. Because we affirm based on Rule 403, we need not consider these alternative grounds for excluding Stafford's testimony.

21

the deprivation was arbitrary or disproportionate to any legitimate evidentiary or procedural purpose"). While the District Court did not permit him to testify that he thought Iyan was on PCP specifically, it allowed him to testify that Iyan's "pupils w[ere] dilated," and that "he looked under the influence" from "whatever he was on." App. at 2552. Stafford clearly disputed the Government's theory that he was arguing with Terrell "over some sort of drug deal." App. at 2555. To the contrary, he testified he observed that, when Terrell arrived at the cookout, both Iyan and his mother "got agitated." App. at 2556. Then, according to Stafford's testimony, Iyan "pulled his gun out," and his mother shouted "kill that motherfucker." App. at 2558. In response, Stafford "screamed out, don't shoot, bro, don't shoot." App. at 2560. And not only did Stafford testify that he did not join the shooting, but that he "didn't have a gun at all that day." App. at 2569. While the District Court's rulings forced Stafford to exclude some details, it did so for sound evidentiary reasons, the exclusions did not change the crux of his story, and we are convinced that the details would not have changed the outcome of his case. We conclude that evidentiary rules applied to Stafford's testimony were neither arbitrary nor disproportionate, but rather permissible applications of longstanding rules aimed at important judicial interests. Thus we do not disturb Stafford's convictions on evidentiary or constitutional grounds.

### G. The Government Provided Sufficient Evidence on the Drug Conspiracy Count.

Stafford argues that the evidence presented at trial was insufficient to convict him on the drug-conspiracy count. We review sufficiency of this preserved argument *de novo*—that is, with a fresh eye—asking "[w]hether, after viewing the evidence in the light

22

most favorable to the government, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 424–25 (3d Cir. 2013) (en banc) (internal quotations and citations omitted) (emphasis in original). "In cases of drug-trafficking conspiracy, the verdict must be upheld as long as it does not fall below the threshold of bare rationality." *United States v. Williams*, 974 F.3d 320, 361 (3d Cir. 2020) (internal quotation marks and citation omitted).

Stafford does not dispute that he bought and sold drugs. His contention is centered on whether he was part of a conspiracy to distribute over one kilogram of heroin, arguing that a large amount of heroin found in a house used by his distributor (707 Broadway) was improperly attributed to him because he had nothing to do with that very large stockpile other than sometimes buying from its distributor. Stafford's Br. at 59–62.

Stafford's argument that he was unconnected to the large stockpile is facially colorable. *See, e.g.*, App. at 1882 (testimony by Jamaal Hamilton, a member of the Grape Street Crips, that Stafford was not to his knowledge inside 707 Broadway); *id.* at 2078–79 (testimony by a DEA agent that he never observed Stafford inside or outside 707 Broadway). But, on the other hand, the Government introduced evidence that was sufficient to support a finding that Stafford was involved with a conspiracy to distribute the much larger amount of heroin. *See, e.g.*, App. at 872–74 (testimony that Cureton, the purported manager of 707 Broadway, told a regular buyer of his to "see Stod [an alias of Stafford's] from now on," and that Stafford and Cureton were like brothers); *id.* at 890 (testimony that Cureton was supplying drugs to Stafford); *id.* at 1689, 1935 (testimony that

23

the drugs associated with Stafford were stamped "Obamacare in red ink" and that some drugs seized from 707 Broadway were also marked "Obamacare in red ink"); *id.* at 1742 (testimony that Cureton was Stafford's "main supplier"); *id.* at 1776–77 (testimony that although Cureton was not a member, the Grape Street Crips would protect him in exchange for his drug distribution). Stafford took the stand and unambiguously testified that he had nothing "at all" to do with the operation at 707 Broadway and that he never sold drugs with, or bought drugs from, Cureton. *Id.* at 2571–72, 2576. But the jury chose to disbelieve his story and instead believed that of the Government. "Reversing the jury's conclusion simply because another inference is possible—or even equally plausible—is inconsistent with the proper inquiry for review of sufficiency of the evidence challenges." *Caraballo-Rodriguez*, 726 F.3d at 432. So we will not disturb Stafford's conviction on this ground.

**H. The Government Provided Sufficient Evidence on the Murder Predicates.**

Finally, Stafford argues that the evidence presented at trial was insufficient to convict him of the RICO and VICAR violations, in particular that Hope's murder was connected with racketeering or the Grape Street Crips. The parties contest whether Stafford properly preserved this argument, which affects whether our review is without deference or for plain error. *See* Gov't Br. at 36; Stafford's Br. at 64. But the standard of review we apply makes little difference here, as we conclude there was no error (and thus there can also be no plain error).

Stafford does not meaningfully contest most of the elements required for a RICO or VICAR conviction, but instead makes a narrow argument: the murder of Hope Williams

24

was not in furtherance of racketeering. *See generally United States v. Irizarry*, 341 F.3d 273, 304 (3d Cir. 2003) ("The district court also instructed the jury in accordance with our precedent, that the government may establish this element by showing either (1) the defendant is enabled to commit the predicate offenses solely by virtue of his position in the enterprise or involvement in or control over the affairs of the enterprise or (2) the predicate offenses are related to the activities of that enterprise." (internal quotation marks omitted)).

Stafford argues that Hope's murder was simply a "man thing," where one person provoked a fight and the others responded in self-defense, having nothing to do with the gang. Stafford's Br. at 64 (quoting App. at 1878). He points to evidence in the record that could support this theory. *See, e.g.*, App. at 1877–78 (testimony that "if somebody does you wrong, you wanted to be able to retaliate," which is part of "[b]eing a man" in Stafford's neighborhood); *id.* at 1083–84 (testimony that guns were procured at Terrell's suggestion, not Stafford's). This is a facially colorable argument, and the jury was free to consider it. But to the extent that Stafford suggests that this fight within the gang (as opposed to fights among gangs) actually hurt the group, rather than further its racketeering purpose, we are not persuaded. On the contrary, "a defendant can commit a predicate act that is detrimental to the enterprise so long as the evidence establishes the requisite nexus between the predicate act and the enterprise." *Irizarry*, 341 F.3d at 304. Here, the Government offered several pieces of evidence linking the shooting that killed Hope and the gang. *See, e.g.*, App. at 900 (testimony that Williams worked as a drug runner for Stafford); *id.* at 919 (testimony that Stafford wanted to confront Iyan about some money

25

he owed Stafford in connection with the drug business); *id.* at 922 (testimony that several gang members backed up Stafford to confront Iyan, but that one person decided not to help because he wasn't a member of the gang).  Given this evidence, we are confident that a reasonable juror could have convicted Stafford on this ground.

*      *      *      *      *

Having carefully reviewed each of Stafford's challenges to his prosecution and conviction, we see no basis to remand for a new trial.  We therefore affirm.